## APPEAL OF STEINBACH CO.

Docket No. 2888.    Submitted June 12, 1925.    Decided January 16, 1926.

1. Taxpayer may include in its statutory invested capital, as paid-in surplus, the proved value of tangible property paid in to a corporation in excess of the par value of its outstanding stock.

2. Unextinguished cost of demolished assets allowed as a deduction from gross income.

3. Depreciation allowed on assets acquired by way of paid-in surplus.

4. Invested capital must be reduced by the amount of the cost to a corporation of the acquisition of its own stock.

*W. A. Staub, C. P. A., H. A. Tufel, Esq.*, and *C. J. McGuire, Esq.*, for the taxpayer.
*Ellis W. Manning, Esq.*, for the Commissioner.

Before STERNHAGEN, LANSDON, GREEN, and LOVE.        •

This is an appeal from the determination of a deficiency in income and profits taxes. The taxable periods involved are the fiscal years ended January 31, 1919, 1920, 1921, and 1922. For the years 1919, 1921, and 1922 the deficiencies are $3,934.89, $6,671.34, and $488.95, respectively, or a total amount of $11,195.18. For the year 1920 the Commissioner admits an overassessment of $5,871.81. The taxpayer concedes that the deficiency in the amount of $6,671.34 for the year 1921 is correct. The total deficiency in controversy is in the amount of $4,423.84.

### FINDINGS OF FACT.

1. The taxpayer is a New Jersey corporation with its principal place of business at Asbury Park, where it conducts a department store. It was incorporated in 1897 as the successor of a sole pro-

prietorship, which had been established by John Steinbach about 1872.

2. At February 1, 1919, the taxpayer had 4,000 shares of common and 5,350 shares of preferred stock outstanding of the par value of $100 per share. At that date John Steinbach owned 3,892 shares of the common and 3,248 shares of the preferred stock. His combined holdings of common and preferred shares represented 76 per cent plus of the taxpayer's total outstanding capital stock. The remaining outstanding stock, in the respective amounts of 108 and 2,102 shares of common and preferred, was owned by A. C. Steinbach and Walter Steinbach, sons of John Steinbach.

3. Prior to February 1, 1919, the buildings in which the taxpayer conducted its operations, the land occupied by such buildings, and the furniture and fixtures used in the business of the taxpayer were owned by John Steinbach and occupied by the taxpayer as a tenant.

4. As early as 1917, John Steinbach, then a man of advanced years, evidenced, through conversations with his sons, a desire to relinquish his active control and retire from the business. The means of bringing about the change of ownership and control were discussed at various times throughout 1917 and 1918, and culminated on February 8, 1919, when, at a meeting of taxpayer's board of directors, John Steinbach submitted to the board two definite offers which, when accepted, would bring about the desired change. The first offer provided that said Steinbach would convey to the taxpayer " the real estate in the City of Asbury Park, owned by him, and now occupied by the company for its business, together with all the personal property appurtenant thereto, for the sum of $300,000, from which price the company might deduct the amount due on his debit balance as the same appears on its books, and which amounts to $239,765.17, as of February 1, 1919." The balance of the purchase price, to wit, $60,234.83, was to be paid in cash and securities of companies other than the taxpayer. The second offer provided that said Steinbach would sell to the taxpayer " all of his shares of common stock therein, now consisting of 3,892 shares and also 1,748 shares of his preferred stock in this company, in consideration of an annuity to be paid him by the company, during his lifetime, in the sum of $6,083.33 per month."

5. Both of the above offers were accepted by the taxpayer's board of directors, and under the terms thereof became effective as of February 1, 1919. Immediately after the transfer to the taxpayer of the real property with its appurtenances and the shares of stock described in the second offer, all of which real and personal property was transferred simultaneously, said John Steinbach's sole interest in the taxpayer was represented by 1,500 shares of preferred stock out of 3,602 shares then outstanding and not in the corporate treasury.

6. The real property and appurtenances thereto received from John Steinbach were entered upon the taxpayer's books in the aggregate amount of $300,000, which amount is equivalent to the purchase price paid by the taxpayer. Later this amount was increased on taxpayer's books to $350,860.15, in order that the book value of the assets would appear at an amount equivalent to the alleged cost of the assets to Steinbach, less the aggregate of all depreciation deductions claimed by him in his individual returns for prior years.

7. The property acquired by the taxpayer as a result of the sale and transfer set forth above had a value greatly in excess of the amount of $300,000. This excess value was paid in to the taxpayer by John Steinbach for the benefit of his sons, A. C. Steinbach and Walter Steinbach, who, on February 1, 1919, became the owners of all of the common stock and, except 1,500 shares, of all the preferred stock of the taxpayer then outstanding, and, by reason of such ownership of common stock, acquired complete control over the affairs and assets of the taxpayer.

8. The fair market values of the real property and appurtenances acquired by the taxpayer on February 1, 1919, were: Land $418,500; buildings $224,020.30; furniture and fixtures $102,127.84—or a total of $744,648.14.

9. The shares of taxpayer's stock sold by Steinbach to the taxpayer were transferred on the stock ledger and taken into the treasury as of the date of sale. Such sale and transfer was unconditional and vested absolute title in the taxpayer. The life annuity to John Steinbach became an absolute obligation of the taxpayer as of the date of sale, was not secured by any pledge of the stock so acquired, and the monthly payments on account of such annuity were not installments on the purchase price of the stock but were in discharge of a contractual obligation between John Steinbach and the taxpayer.

10. The transaction through which the taxpayer acquired this stock from Steinbach was not recorded at the time in the taxpayer's general ledger accounts. No asset account was set up to show the cost of this stock to the taxpayer, nor was there any entry in the accounts recording the taxpayer's liability under its contractual obligation to Steinbach. In lieu of such entries, the taxpayer has monthly charged to a treasury stock account the annuity payments actually made to Steinbach. In the computation of its invested capital for the years under review, the taxpayer failed to give consideration to the amount of liability incurred to acquire the treasury stock from Steinbach or to its actual liability to that individual.

11. On February 1, 1919, John Steinbach was 78 years of age, and, according to the standard American mortality tables, had a life expectancy of 5.11 years.

12. The building used in the operations of the taxpayer was enlarged from time to time as the growing business required more space. At the beginning of 1921 only a portion of such building was five stories in height. More floor space having become necessary, the taxpayer voluntarily demolished the old fractional fifth floor for the purpose of raising the entire building to the height of five stories. An architect, representing the taxpayer, and the contractor who had undertaken to do the work of demolition for ten per cent of the unextinguished useful value of the property to be removed, estimated that such unextinguished useful value was $20,093, taking into consideration the original cost in 1905, the accrued depreciation and the increased cost of construction in 1921. The original cost of the demolished fifth floor was $14,500; the cost of demolition was $2,009.50. Nothing was realized from salvage, and such original cost was exhausted to the extent of 48 per cent at the date of demolition.

13. Upon audit of the taxpayer's income and profits-tax returns for the taxable years involved in this appeal, the Commissioner excluded from invested capital the amount of $444,648.14, the value over cost of assets acquired as above set forth on February 1, 1921; disallowed the deduction of $21,097.65 as a loss resulting from the demolition of the fifth story of the building owned by the taxpayer, but included such net loss in the computations of the taxpayer's invested capital; and computed depreciation on the taxpayer's building at 3 per cent annually on a valuation of $159,960, and on the furniture and fixtures at the rate of 10 per cent annually on a valuation of $73,350 as of February 1, 1919.

### DECISION.

The deficiency, if any, should be computed in accordance with the following opinion. Final determination will be made on 10 days' notice, under Rule 50.

### OPINION.

LANSDON: This appeal presents three issues for determination by the Board: (1) Whether the assets which the taxpayer acquired at February 1, 1919, should be included in the computation of its statutory invested capital for each of the fiscal years ended January 31, 1919, 1920, and 1921, at a total value in excess of the consideration paid therefor; (2) the deductibility from the taxpayer's gross income for the fiscal year ended January 31, 1919, of a loss of the unextinguished useful value alleged to have been sustained as a result of the voluntary demolition of the fifth story of the taxpayer's

building; and (3) whether the taxpayer is entitled in the computation of its tax liability to an allowance for depreciation on the fair market value of the tangible assets acquired as above set forth from the date of such acquisition.

The evidence in support of the facts upon which the taxpayer relies to establish its first contention is clear and convincing. Properly qualified experts on real estate and other asset values testified as to the fair market values of the properties acquired by purchase and gift at February 1, 1919. Such proof of value was not weakened or in any way discredited either by cross examination of witnesses or the introduction of testimony in rebuttal. The Board is of the opinion that the property in question had a fair market value of $744,648.14 at the date of its transfer to the taxpayer.

Having determined that the property received by the taxpayer had a definite value at the date of its acquisition, it still remains for the Board to consider whether such value shall be included in the computation of the taxpayer's statutory invested capital for the years in question. The pertinent parts of section 326 (a) of the Revenue Acts of 1918 and 1921 provide:

That as used in this title [Title III War Profits and Excess Profits Taxes] the term " invested capital " for any year means * * * :

(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year.

For the proper administration of the provision herein quoted, the Commissioner formulated and promulgated article 837 of Regulations 45, as follows:

Where it is shown by evidence satisfactory to the Commissioner that tangible property has been paid in by a stockholder to a corporation as a gift or at a value definitely known or accurately ascertainable as of the date of such payment clearly and substantially in excess of the cash or other consideration paid by the corporation therefor, then the amount of the excess shall be deemed to be paid-in surplus. * * *

General accounting practice also supports the contention of the taxpayer.

Paid-in surplus also arises where donations for working capital purposes or otherwise are made to the corporation. Premiums from the sale of capital stock, donated stock and gifts to corporations are examples. Kohler, Accounting Principles Underlying Federal Income Taxes, 1925, p. 115.

The Supreme Court, in *La Belle Iron Works* v. *United States*, 256 U. S. 377—

recognizes that in some cases contributions are received from stockholders in money or its equivalent for the specific purpose of creating an actual excess capital over and above the par value of the stock.

It is clear that there is ample legal basis for the taxpayer's contention that the value of the property paid in in excess of the con-

sideration paid therefor should be deemed to be paid-in surplus. On this point the law, the authority of decided cases, the administrative regulations of the Commissioner, and the best accounting practice are clear and harmonious.

The only remaining question involved in the taxpayer's first contention is whether the transaction through which the assets in question were acquired is within the provisions of section 331 of the Revenue Act of 1918 and the possible resulting limitations in the amounts that can be included in invested capital. The pertinent provisions of that section are as follows:

> In the case of the * * * change of ownership of property, after March 3, 1917, if an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them, then no asset transferred or received from the previous owner shall, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under this title in computing the invested capital of such previous owner if such asset had not been so transferred or received: *Provided,* That if such previous owner was not a corporation, then the value of any asset so transferred or received shall be taken at its cost of acquisition (at the date when acquired by such previous owner) with proper allowance for depreciation, impairment, betterment or development. * * *

Three questions must be considered in the application of this provision of the law to the facts of the instant appeal: (1) Whether an interest of 50 per cent or more in the assets transferred *remained* in the same parties; (2) whether, by reason of the annuity contract, John Steinbach retained either an actual or contingent ownership of a sufficient number of the shares transferred for 50 per cent of the value of the assets in question to remain in him; and (3) if this provision applies, what was the value, in the hands of the prior owner, of the assets transferred.

The evidence proves that John Steinbach made an unconditional sale of all of his common or voting stock to the taxpayer and that, subsequent to February 1, 1919, his only property interest in the taxpayer was that of an owner of a minority of the nonvoting preferred stock. It is true that the consideration was an annuity to be paid by the taxpayer, but Steinbach was not protected against default of such payment by any actual or implied pledge of the transferred shares of stock as collateral and in no event had any contingent or reversionary interest or title in such stock. The transfer was absolute. The taxpayer's title to the stock was perfect. It therefore follows that an interest or control of 50 per cent or more of the assets transferred did not *remain* in the same persons or any of them, and that the provisions of section 331 of the Revenue Act of 1918 do not apply to the transfer in question. The first two points having been so decided, it is unnecessary to discuss the question of the value of the transferred assets as determined by their cost to the prior owner.

The Board is of the opinion that the taxpayer is entitled to have the amount of $444,648.14, the value of the property paid in on February 1, 1919, in excess of the consideration paid therefor, included in the computation of its invested capital as paid-in surplus for each of the fiscal years ended January 31, 1919, 1920, 1921, and 1922, respectively.

We have pointed out in our findings of fact the failure of the taxpayer to record upon its books of account the transaction through which it acquired 3,892 shares of its common and 1,748 shares of its preferred stock. It is our opinion that the method adopted in recording this transaction on the books of account, by charging to treasury stock account the monthly annuity payments to Steinbach as they are made, does not correctly reflect the taxpayer's invested capital.

.With the conveyance of this stock to the taxpayer by Steinbach the sale became absolute, and title to the stock vested thereafter solely in the taxpayer. At the same moment the taxpayer's liability to Steinbach for the purchase price of the stock became fixed and determined. It remained only to ascertain the amount of the purchase price and that depended upon the length of time Steinbach would live. To have properly recorded the transaction upon the books, treasury stock account should have been debited with the probable purchase price, determined as hereinafter indicated, and a corresponding credit entry made to a liability account set up for the purpose of evidencing the taxpayer's obligation to Steinbach on account of the purchase price of the stock.

We have found that at the date of the transaction Steinbach was 78 years of age, and, according to American mortality tables, had a life expectancy of 5.11 years. Since the taxpayer agreed to pay Steinbach an annuity of $6,083.33 per month as long as he should live, it is apparent that the probable purchase price of the stock at the date of acquisition was $373,029.80 ($6,083.33×12×5.11), and this is the amount which should have been recorded on the books as the cost of this stock and as the amount of the taxpayer's liability on account of the purchase price thereof. Actual expenditures in excess of the above estimate add to the cost of treasury stock when made.

The requirement that this liability be recorded upon the books as of the date of the transaction is sound, since it represents a liability actually incurred as of that date to pay to Steinbach a stipulated monthly annuity as long as he should live. It represents an actual liability, and, therefore, borrowed money, just as truly as if the taxpayer had issued to Steinbach a series of notes payable evidencing the payments to be made to him during his life expectancy.

In the computation of invested capital the cost of acquiring treasury stock must be eliminated from the assets, on the theory that the amounts representing such cost have been withdrawn from the business and returned to the stockholders. Hence, the invested capital of this taxpayer for each of the years under consideration should be reduced by the cost of the stock purchased from Steinbach, such cost, when predicated upon the agreed annuity based upon a life expectancy of 5.11 years, being $373,029.80.

The taxpayer adduced no evidence that convinces us that it is entitled to deduct the amount of $21,097.30 from its gross income and profits tax return for the fiscal year ended January 31, 1921. The fractional fifth story of the building in question had been constructed in 1905. To secure more floor space and better operating facilities the taxpayer voluntarily demolished the said fractional fifth story and erected a new fifth story extending over the entire structure. The unextinguished cost at the date of demolition was $7,540, and this amount, together with the cost of demolition, should be allowed as the deduction.

The opinion of the Board, *supra*, in respect of the taxpayer's invested capital, controls the third issue in this appeal. Depreciation of the value of the tangible assets acquired by way of paid-in surplus, and included in invested capital, should be allowed at proper rates and considered in the computation of the invested capital and tax liability of the taxpayer for the fiscal years ended after February 1, 1921.

STERNHAGEN, dissenting, in part: I disagree with so much of the decision as is based upon the reduction of invested capital by the amount of the estimated cost of the stock received from Steinbach.

On reference to the Board, TRUSSELL joins in the dissent.