**STEINBACH KRESGE CO. v. STURGESS,**
Collector of Internal Revenue
(two cases).
Nos. 2672, 3052.

District Court, D. New Jersey.
June 28, 1940.

Wall, Haight, Carey & Hartpence, Thomas G. Haight, all of Jersey City, N. J., Robert H. Montgomery and James O. Wynn,

both of New York City, and Alan B. Pinkerton and F. W. Schumann, both of Jersey City, for plaintiff.

John J. Quinn, U. S. Atty., and B. Thorn Lord, Asst. U. S. Atty., both of Trenton, N. J., Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe and Lester L. Gibson, Sp. Assts. to Atty. Gen., for defendant.

CLARK, District Judge.

The case at bar suggests the familiar difficulty of applying a statute phrased in terms of economic common places to an economically unique transaction. The statute is that which allows corporations a deduction from gross income of "losses sustained during the taxable year".[1] The transaction is a modern variant of the traditional family settlement whereby an aging parent transfers Blackacre to his offspring, receiving in return their promise to pay him an annuity roughly commensurate with the annual rents yielded by Blackacre. In 1919 a father, aged 78, owned an overwhelming majority stock interest in the plaintiff family corporation, the minority interest being held by his two sons. For the past five years, his income from that source had averaged $80,940 per annum.[2] As of February 1, 1919, he transferred his holdings to the plaintiff corporation in consideration of its promise to pay him a $73,000 annuity. The uniqueness of this simple arrangement lies in the fact that it mixes two ordinarily distinct economic structures—a purchase of stock, and an annuity venture. Contrast between the two complicates the academic background of the legal question at bar: to what extent, if any, may the plaintiff deduct its annuity payments, as losses?

If our circumstance is likened to a stock purchase, the annuity payments become instalments of the purchase price. They are, in that event, capital expenditures, and no gain or loss is realized until the transaction is closed in the orthodox manner by the purchaser's disposition of the stock. Though counsel refrain from citation on the point, many authorities seem to have adopted this view.[3] On the other hand, a majority of the Board of Tax Appeals and the Second Circuit Court of Appeals have stressed the annuity venture aspect of the transaction, Commissioner v. John C. Moore Corp., 42 F.2d 186, affirming, 15 B.T.A. 1140. The annuity is deemed to be issued for cash equal to the fair market value of the property transferred. So, annuity payments in excess of the value of the consideration for the annuity contract (the property transferred) are considered deductible as losses in the year in which made.[4] Curiously, there is little, if any, actual conflict in the decisions. That is to say, the decisions applying the capital expenditure theory seem to have done so in the absence of any showing as to the value of the property exchanged for the annuity, upon which a different result might be predicated under the annuity venture theory. Conversely, the Moore case, if confined strictly to its facts, merely amounts to the affirmance of a deduction allowed by the Board under a different section of the statute.

The clash, therefore, is between theories rather than precedents. We incline toward the capital expenditure theory. To be sure, these stock-for-annuity transactions do not fit the usual pattern of a purchase, because purchase prices are almost by definition fixed, and not elastic. As a practical matter, however, it seems

---

[1] Revenue Act of 1924, § 234(a)(4), 43 Stat. 253, 26 U.S.C.A.Int.Rev.Acts, page 40; Revenue Act of 1926, § 234(a)(4), 44 Stat. 9, 26 U.S.C.A.Int.Rev.Acts, page 186; Revenue Act of 1928, § 23(f), 45 Stat. 791, 26 U.S.C.A.Int.Rev.Acts, page 357.

[2] $73,948 from 3,892 shares of common stock plus $6,922 from 1,748 shares of 4% preferred stock.

[3] Mastin v. Commissioner, 8 Cir., 28 F.2d 748, affirming 7 B.T.A. 72; Scott v. Commissioner, 7 Cir., 29 F.2d 472; Klein v. Commissioner, 7 Cir., 84 F.2d 310, affirming 31 B.T.A. 910; Edwards v. Commissioner, 10 Cir., 102 F.2d 757;

Denman Estate Co. v. Commissioner, 2 B.T.A. 633; J. C. Moore Corp. v. Commissioner, 3 B.T.A. 430; Fuller v. Commissioner, 11 B.T.A. 1025; Evans v. Commissioner, 23 B.T.A. 156; See also, Magill, Tax Liability of Annuities, 33 Yale Law Journal 229, 238 et seq.; I.T. 1662, II—1 CB 122; S.M. 3141A, IV—2 CB 183; 99 A.L.R. 624 (note); 1940 Prentice Hall Tax Service, para. 11.256; 401 CCH para. 345.04.

[4] See I.T. 1242 1—1 CB 61; I.T. 1484 1—2 CB 66; 1 Klein, Federal Income Taxation § 16:14, p. 458; 1 Paul & Mertens, Law of Federal Income Taxation § 5.34, p. 136; Montgomery, Federal Income Tax Handbook, p. 498.

possible to wait until that elasticity has ceased by reason of the annuitant's death, and to use the "price" so determined as the annuity writer's cost basis of capital gain or loss upon the eventual disposition of the stock. If the writer disposes of the stock before the annuitant dies, it would seem reasonable to defer the calculation of gain or loss until death occurs. The transaction, in view of its uniqueness, may be deemed to remain open, even after disposition, to await the fixing of cost. There is no statutory command for a reckoning of tax immediately upon disposition which would compel the establishment of cost by actuarial values on analogy to federal estate tax practice. See Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647; 9 Boston University Law Review 288. Similarly unique transactions have been deemed to remain open after disposition to await the fixing of selling price. Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143. The annuity venture theory, on the other hand, though achieving the same result in the long run, entails, by that very token, the anomalous realization of both gains and losses from what is essentially the same transaction.[5] In addition it presents the difficulty of finding property values in every case. The most that can be said in its favor is that it conforms to the somewhat obscure concept of property for annuity transactions developed conversely with respect to the annuitant's capital gain or loss.[6] But that concept has been moulded to fit a special statute which taxes annuity returns as income[7]—a statute which does not, by its terms, apply to annuity writers.

Any final choice between the two theories would necessitate extensive sifting and analysis of many further complexities —those occasioned by the element of gratuity often present in these transactions, to mention but one. We are not, however, constrained to, and do not attempt, that choice. The plaintiff corporation cannot, by hypothesis, succeed under the capital expenditure theory, nor can it, under the circumstances at bar, succeed under the annuity venture theory. Its annuity payments,

---

[5] Suppose A corporation writes a $100 annuity on B's life in return for stock appraised at $1,000. Fourteen years later B dies having received $1,400. The A corporation then disposes of the stock for $1,400. According to the annuity venture theory, A corporation would be allowed a $100 loss for the four years preceding B's death, but would thereafter incur a $400 taxable gain, $1,000 presumably being considered the basis for the property. Under the capital expenditure theory, no gain or loss would occur.

[6] In this class of cases it is assumed that the property is exchanged for the annuity contract. The "value" of that contract (computed actuarially), above or below the cost of the property, is taken as the measure of gain or loss. Guaranty Trust Co. v. Commissioner, 15 B.T.A. 20 (gain) and see G.C.M. 1022 VI—1 CB 12 (gain). More recent decisions have refused to tax the gain so measured, but on the narrow ground that the contract has no "market value" as required by statute, I.R.C. § 111 (b), 26 U.S.C.A.Int.Rev.Code, § 111 (b), since an individual annuity writer's ability to keep on making payments is problematical. Lloyd v. Commissioner, 33 B.T.A. 903; Deering v. Commissioner, 40 B.T.A. 983. Compare Evans v. Rothensies, July 26, 1939 [no opinion for publication].

[7] When and insofar as aggregate annuity payments exceed the consideration for the annuity contract, they are taxed in toto as income, Revenue Act of 1924, § 213 (b)(2), 26 U.S.C.A.Int.Rev.Acts, page 20; Revenue Act of 1926, § 213 (b)(2), 26 U.S.C.A.Int.Rev.Acts, page 163; Revenue Act of 1928, § 22(b)(2), 26 U.S.C.A.Int.Rev.Acts, page 354. These and later statutes, I.R.C. § 22(b)(2), 26 U.S.C.A.Int.Rev.Code, § 22(b)(2) (which permit in addition the taxation of all annuity payments to the extent that they equal three per cent of the consideration) have been held applicable to annuities received in exchange for property. Gillespie v. Commissioner, 38 B.T.A. 673; See also, Continental Illinois Bank & Trust Co. v. Blair, 7 Cir., 45 F.2d 345, and cf. Raymond v. Commissioner, 40 B.T.A. 244. As a result, taxation of annuity payments may overlap the taxation of gains on the sale of the property. To avoid this, the transaction must be divided into an exchange of property for an annuity contract. There is, however, no corresponding overlap as to losses. Annuitants' losses on annuity ventures are not deductible because such ventures are held not to be transactions entered into for profit. Industrial Trust Co. v. Broderick, D.C., 19 F.Supp. 961, affirmed 1 Cir., 94 F.2d 927, certiorari denied 304 U.S. 572, 58 L.Ed. 1040, 82 L.Ed. 1536; See also Helvering v. Louis, 64 App.D.C. 263, 77 F.2d 386, 99 A.L.R. 620; Lambert v. Commissioner, 40 B.T.A. 801, and compare Evans v. Rothensies, above cited.

extending from February 1, 1919, to January 31, 1929, total some $723,914.66. We are convinced that the stock received for the annuity could not have had, as of February 1, 1919, a value of less than that amount. This appears from valuations set by the plaintiff company on its own assets in an earlier tax controversy, and from the financial status of the company as revealed in that controversy. See Appeal of Steinbach Company, 3 B.T.A. 348. Moreover, a capitalization of prior earnings on the stock at the usual minimum of 10% approximates a value of at least $809,400. Indeed, the fact that the annuity was some $7,000 less than average annual earnings on the stock strongly suggests that it was and has been actually, though not in legal strictness, payable out of those earnings alone. As a consequence, the return of capital feature of an annuity venture seems only remotely involved. See Magill, Taxable Income, pp. 376 et seq.

The plaintiff, however, insists that the measure of loss under the annuity venture theory is not the value of the consideration received by the annuity writer, but rather the period of time for which annuity payments continue. Seizing upon the fact that the payments at bar were made for ten years to an annuitant, whose life expectancy at the inception of the venture was but 5.11 years (according to the American Experience Table of Mortality), it asserts that payments made after the expiration of that expectancy are deductible. The assertion evidences, we think, an obvious misinterpretation of certain dicta in the Moore case. The following remarks are typical: "if he [the annuitant] lives longer than the expectancy, the entire amount of each subsequent installment is treated as gain to him and loss or expense to the writer." Commissioner v. John C. Moore Corp., above cited, 42 F.2d at page 189.

The term "expectancy" as so employed does not refer to a life expectancy shown in standard mortality tables. What is referred to is a theoretical "expectancy" of the life deduced by a discount computation from the agreed *market value* ascribed to the *property* transferred as consideration for the annuity contract in that case. This "expectancy", from the very conditions of its formulation, came to an end at the precise moment when aggregate payments under the annuity contract began to exceed that value, plus the discount on each payment. The criterion of loss thus established is clearly the value of the annuity's consideration, not the mortality table expectancy of the annuitant.

The only conceivable connection between an annuitant's life expectancy and an annuity writer's economic reverses lies in the relationship between the expectancy and the actuarial value of the annuity. Technically that relationship is non-existent, it being almost an axiom of actuarial science that the accurate calculation of annuity values is not based upon life expectancy. Wolfe, Inheritance Tax Calculations, pp. 13, 14. Assuming, however, a rough correspondence between actuarial value and the product, life expectancy times annual payments, some argument can be made that, since equals are ordinarily exchanged for equals, the actuarial value of the annuity contract should be deemed to be the value of its consideration.

■ To our mind this argument overlooks a salient point. Annuity considerations determine annuity values, not vice versa. Actuarial values merely reflect the price (single premium) which experienced annuity writers (insurance companies) exact for annuity contracts on normal lives. By the same token the value of any particular annuity contract reflects the consideration (apart from any element of gratuity) received by the particular writer of that particular contract. So equals are exchanged for equals, but only in the sense that the consideration equals the value of the annuity contract. The value of the contract will correspond with its actuarial value if the writer is an insurance company. It may or may not so correspond if the writer is a free lancer. In that event the parties may have reason to envisage an abnormally short or long life, thus ascribing to the contract an abnormally small or great value. One cannot, as in the valuation of life interests according to actuarial values, suppose recourse to the market prices fixed by insurance companies. The fact is that the annuitant deliberately forsook the insurance market and established his own. Actuarial values per se have, therefore, no logical bearing upon the value of a non-commercial annuity contract issued in return for property, except in the rare case where such property is incapable of valuation by any other adequate means.[8]

All in all, we think that the state of an amateur annuity writer's pocketbook has

---

[8] Compare, however, the cases cited in footnote 6 above.

a somewhat more direct effect upon his ability to pay than the hypothetical state of an insurance company's treasury after undertaking an annuity on the life of an average man who resembles the particular annuitant in age alone. Taxes are paid with money, not vital statistics.

There remains the question of whether portions of plaintiff's annuity payments are deductible as interest on indebtedness.[9] According to the great weight of authority they are not,[10] and the cases appear to be correct in principle. "Indebtedness" as used in the statute has been held to require an unconditional promise to pay. Gilman v. Commissioner, 8 Cir., 53 F.2d 47, 80 A.L.R. 209, affirming 18 B.T.A. 1277, and cases there cited; compare, Commissioner v. Tennessee Co., 3 Cir., 111 F.2d 678. What is more important, the transaction at bar leaves but little play for the settled conception of interest, i. e., compensation for the use, forbearance, or detention of money. See Black's Law Dictionary (3d Ed.) p. 996. Any use and detention of money (the annuity payment) on the part of the writer, or its forbearance on the part of the annuitant, must result from the postponement of those payments into the future. Such postponement is for the mutual benefit of the annuitant and the writer, if not primarily for the benefit of the annuitant. Consequently it is difficult to conceive of the annuitant as exacting "compensation" in return for what he desires—the security and peace of mind afforded him by the regular future payment of annuity instalments. That being so, we decline to follow the Board's opinion in the Moore case, which is the sole authority for permitting the interest deduction in our circumstance. Its affirmance, moreover, turned inter alia upon the annuity venture theory of capital loss, and it appears to have been subsequently overruled by the Board itself, Klein v. Commissioner, above cited.

Judgment will be entered for the defendant.

[9] Revenue Act of 1924, § 234(a)(2), 43 Stat. 253, 26 U.S.C.A.Int.Rev.Acts, page 39; Revenue Act of 1926, § 234(a)(2), 44 Stat. 9, 26 U.S.C.A.Int.Rev.Acts, page 186; Revenue Act of 1928, § 23(b), 45 Stat. 791, 26 U.S.C.A.Int.Rev.Acts, page 356.

[10] Scott v. Commissioner, 7 Cir., 29 F. 2d 472; Mastin v. Commissioner, 8 Cir., 28 F.2d 748, affirming 7 B.T.A. 72; Klein v. Commissioner, 7 Cir., 84 F.2d 310, affirming 31 B.T.A. 910; 99 A.L.R. 624 (note); Denman Estate Co. v. Commissioner, 2 B.T.A. 633; I.T. 1242 1—1 CB 61; I.T. 1481 1—2 CB 66 (all above cited); Curtis v. Commissioner, 26 B. T.A. 1103. See also Corbett Investment Co. v. Helvering, 64 App.D.C. 121, 75 F.2d 525; Daniel Bros. v. Commissioner, 5 Cir., 28 F.2d 761.