John C. W. DIX and Caroline W. Dix, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

George E. DIX, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 11308, 11309.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 9, 1967.

Decided April 2, 1968.

---

Richard A. Bishop, Washington, D. C., for petitioners.

Stephen H. Paley, Attorney, Department of Justice (Richard C. Pugh, Acting Asst. Atty. Gen., Meyer Rothwacks and Harold C. Wilkenfeld, Attorneys, Department of Justice, on brief), for respondent.

Before HAYNSWORTH, Chief Judge, MARVIN JONES, Senior Judge, U. S. Court of Claims,* and BOREMAN, Circuit Judge.

MARVIN JONES, Senior Judge:

Taxpayers,[1] private individuals, entered a written arm's-length contract with their 79-year-old mother, dated June 20, 1960, under which they received corporate stocks worth $162,689.75 in exchange for their promise to pay her $22,452.00 per year in semiannual installments for the remainder of her life. Immediately following this transaction, and before any payment was made to their mother, taxpayers sold a portion (74.433 percent) of these corporate stocks to a third person for $121,095.00, which was their fair market value. Two issues are involved in this case. The first concerns the amount of tax owed by taxpayers on this sale of a portion of the corporate stocks to the third party. The second issue is whether taxpayers are entitled to deduct as

---

* Sitting by designation of the Chief Justice.

1. The annuitant's three children, two sons and a daughter, were the annuity writers under the contract. Only the two sons are formally before the court in this case.

interest part of the annuity payments to their mother.

### Tax on Sale of Stocks

The parties agree that taxpayers' basis in the stocks sold was equal to 74.433 percent of the then current value of the annuity payments to be made to taxpayers' mother. They disagree, however, over which table is to be used to determine this value, and this is the issue we must decide.

Rev.Rul. 55–119, 1955 Cum.Bull 352 requires that tables found in Treas.Reg. §§ 20.2031–7 and 25.2512–5 shall be used to value arm's-length, private annuity contracts.[2] These tables were constructed for use under the estate and gift tax laws for valuation of private annuity contracts as opposed to annuity contracts issued by companies regularly engaged in their sale.[3] Applying these tables, the Commissioner determined that taxpayers' basis in the stocks they received was $114,532.08. Taxpayers contend that the use of the estate and gift tax tables was arbitrary and unreasonble and that the Commissioner should have used either (1) the annuity premium table of a commercial life insurance company, under which their basis would be $162,689.75, or (2) Table I of Treas.Reg. § 1.72–9, used in computing the tax owed by annuitants, under which their basis would be a minimum of $165,248.67.

The Commissioner's deficiency determinations are presumptively correct. To overturn his use of the estate and gift tax tables, taxpayers must prove that their use in this case is arbitrary and unreasonable. See Koshland's Estate v. Commissioner of Internal Revenue, 177 F.2d 851 (9th Cir. 1949).

The evidence with respect to the commercial tables showed that rates charged by commercial life insurance companies are affected by several factors which are not usually present when an annuity contract is acquired from a private person. Norman Greenberg, an actuary with the Internal Revenue Service, testified that:

(a) Companies are regulated by the state; their investments are restricted and they are required to maintain sufficient reserves to assure that the annuity payments can be made;

(b) Companies' prices include a "loading factor," i. e., a margin for profit and expenses; and

(c) Actuarial experience shows that purchasers of annuity contracts from commercial life insurance companies have significantly longer life expectancies than average persons. One doesn't ordinarily buy an annuity contract unless he knows he is in good health.

Each of the above factors operates to increase the cost of commercial annuity contracts above the cost of private annuity contracts with comparable payments. Furthermore, the huge assets of companies as opposed to the much smaller assets of most private individuals makes a commercial annuity contract worth more than a private one. Because of these differences, tables used by commercial life insurance companies are not used by the Commissioner in valuing private annuities.

This testimony strongly supports the Commissioner's refusal to apply commercial tables, and taxpayers have entered no evidence to the contrary. They have, however, made several arguments in an attempt to weaken the Commissioner's evidence and show that his use of the estate and gift tax tables, rather than commercial tables, was arbitrary and unreasonable.

Taxpayers urge that the testimony of Greenberg was "a series of conclusions

---

2. Rev.Rul. 55–119 actually refers to Table I of § 86.19(f) of Treas.Reg. 108 (1939 Code). This table, as amended to reflect a lower rate of interest, now appears in Treas.Reg. §§ 20.2031–7 and 25.2512–5.

3. Commercial annuity contracts are valued differently from private annuity contracts under the estate and gift tax regulations. Compare Treas.Reg. §§ 20.2031–7 and 25.2512–5 with Treas.Reg. §§ 20.2031–8 and 25.2512–6.

and opinions that have little or no probative effect." This argument is unpersuasive, because (1) taxpayers have introduced no evidence to the contrary, and (2) the principles Greenberg discussed have been recognized in other cases involving similar problems. See, e. g., McMurtry v. Commissioner of Internal Revenue, 203 F.2d 659 (1st Cir. 1953); Koshland's Estate v. Commissioner of Internal Revenue, supra; Steinbach Kresge Co. v. Sturgess, 33 F.Supp. 897 (D.N.J.1940).

Taxpayers contend that, since this was an arm's-length annuity transaction, binding on all the parties, their mother should be attributed a life expectancy as great as those of purchasers of commercial annuity contracts.

The Tax Court rejected this argument with the observation that there was "no evidence that the longer life expectancy of persons who purchase commercial annuities is applicable to petitioners' mother." Dix v. Commissioner of Internal Revenue, 46 T.C. 796, 802 (1966). We agree with the court below that some further evidence would be required before taxpayers' mother could be attributed a life expectancy above that of the average person. The reasons were well stated in the *Steinbach Kresge* case, 33 F.Supp. at 900:

> The value of the contract will correspond with its actuarial value if the writer is an insurance company. It may or may not so correspond if the writer is a free lancer. In that event the parties may have reason to envisage an abnormally long or short life, thus ascribing to the contract an abnormally small or great value. One cannot * * * suppose recourse to the market prices fixed by insurance companies. The fact is that the annuitant deliberately foresook the insurance market and established his own.

Moreover, even if we were to agree that taxpayers' mother should be given the life expectancy of an annuitant with a commercial contract, it would not follow that it was arbitrary or unreasonable in this case to apply the Commissioner's tables, because the other important differences revealed by the evidence still remain between the values and costs of commercial and private annuity contracts. As noted above, the value of commercial annuity contracts is greater because of the greater financial strength of the promissor. Also, the price charged for commercial annuity contracts is increased by extra allowances for expenses, profits, and legally imposed investment restrictions and reserve requirements.

Another argument raised by taxpayers is based on Rev.Rul. 62–137, 1962–2 Cum. Bull. 28. This ruling states that annuity contracts issued by corporations, trusts, funds or foundations which enter annuity contracts "from time to time," but which are not commercial insurance companies, may be valued by the same standards as commercial annuity contracts. Taxpayers point out that Rev. Rul. 62–137 places no restrictions on the financial condition, outside regulation, etc. of the organization paying the annuity, and they urge that this ruling is also applicable to individuals. We do not agree.

It will be noted that, by its terms, this ruling applies only to organizations which enter annuity contracts "from time to time." We believe that it was intended to embrace only those organizations which write enough annuity contracts to obtain a good spread of the actuarial risk.

Taxpayers contend that to give the annuity contract in question a lower value than is ascribed to a commercial annuity contract is to say that a contract of this type enjoys less dignity than a commercial contract. As the Commissioner points out, however, to say that this contract has a lower value is not to say anything about its "dignity"; it is only to say that this contract is not worth as much because taxpayers cannot give as great assurance of repayment as a commercial company.

The estate and gift tax tables, as taxpayers have observed, do not distinguish between males and females. How-

ever, this fact alone is not sufficient to prove the use of these tables arbitrary or unreasonable. The Court of Appeals for the First Circuit has dealt with a similar contention in McMurtry v. Commissioner of Internal Revenue, 203 F.2d 659, 666–667 (1st Cir. 1953):

> The whole problem of valuing individual life interests by resort to mortality tables is at best a matter of educated guesswork. The courts cannot demand perfection in an area so fraught with speculation and uncertainty. * * * [T]ables which have enjoyed such widespread and long-standing use should not be rejected as wholly unreasonable, even though they may perhaps be susceptible of minor improvements in particular respects. Such discrepancies as may exist will no doubt average out in the long run; and while this may sometimes prove to be unfortunate for individual taxpayers, the discrepancies may have to be suffered in the interest of a simplified overall administration of the tax laws.

Taxpayers emphasize that the table used by the Commissioner in the taxation of annuitants, Treas.Reg. § 1.72–9, Table I, differs from the table he used in the instant case. Treas.Reg. § 1.72–9, Table I lists the expected return multiple for taxpayers' mother at 10.1 times the annual payment. Under the tables used in the instant case, the value of the annuity is only 5.0572 times the annual payment. Taxpayers contend that the Commissioner has acted inconsistently and unfairly in using different tables for annuitants and annuity writers, and urge that Treas.Reg. § 1.72–9, Table I is the proper table for use in this case.

■ We cannot agree. There is no inconsistency in the use of different tables, because the tax treatment of annuitants differs from that of the taxpayers in this case, and the functions of the tables differ also. The evidence indicates that Treas.Reg. § 1.72–9, Table I is a table of life expectancies of persons who have purchased annuity contracts from commercial insurance companies. It is used in determining the portion of the annuity payment which the annuitant may exclude from gross income in instances where the expected return is based on the annuitant's life expectancy. The estate and gift tax tables are not based merely on life expectancy; they are mortality tables with a built-in discount factor, and their purpose is to value private annuity contracts rather than estimate the annuitants' life expectancy. Since taxpayers' basis in the stocks is equal to the value of their mother's private annuity, use of the latter tables appears appropriate in this case. In any event, their use is certainly not proven arbitrary or unreasonable merely because they differ from Treas.Reg. § 1.72–9, Table I.

*Interest Deduction*

■ The taxpayers assert that, since the actual amounts of the future annuity payments were discounted in order to arrive at their present value, they should be allowed a similar deduction of interest in calculating their gain from their sale of the securities that had been transferred to them by Janet Dix, as consideration for their promising to pay her certain specified lifetime annuity payments.

The taxpayers rely on the case of John C. Moore Corp., 15 B.T.A. 1140 (1929), aff'd, 42 F.2d 186 (2d Cir. 1930). The *Moore* case stands practically alone. The case did not arise until the annuity payments had exceeded the agreed value. Even so, 7 of the 16 Tax Court judges dissented on the ground that "no part of the amounts paid by the corporation to the seller of the building can be deducted, because all payments are the purchase price or cost of the building and such an investment of capital is not deductible." The Second Circuit, in affirming *Moore*, expressly did not rule on the interest question.

Practically all other courts, including other decisions of the Tax Court, have

refused to follow the *Moore* case.[4] Most courts hold that the entire amount of each annuity payment constitutes a payment of the purchase price of the assets received in exchange for the promise to pay the annuity. Thus the payments constitute capital expenditures, no part of which is excludable as "interest on indebtedness."[5] Many other cases, which have not considered the specific question of interest, have agreed with the general theory of the above cases that private annuity payments in return for property constitute capital expenditure. E. g., Citizens Nat'l Bank of Kirksville, Mo. v. Commissioner of Internal Revenue, 122 F.2d 1011 (8th Cir. 1941), cert. denied, 315 U.S. 822, 62 S.Ct. 913, 86 L.Ed. 1219 (1942).

It is doubtful whether the question of interest as such has any bearing on the case. The parties do not expressly provide for interest. They contemplated a sale, not an indebtedness. By its simple terms it is an unambiguous transaction. Clear language does not call for a tortured interpretation. Furthermore, it has been held that an obligation to make annuity payments is not such "indebtedness" as will justify an interest deduction under the tax law. The liability of the annuity writer is contingent upon the continued existence of the measuring life. Edwin M. Klein, 31 B.T.A. 910 (1934), aff'd, 84 F.2d 310 (7th Cir. 1936). Only after the annuity payment becomes due and owing does "interest" which is deductible under section 163 accrue.

Taxpayers sold approximately three-fourths of the securities almost immediately after they gained control. They thus had the value of the use of the $121,095.00, less taxable gain, on a gradually reducing basis through the period of installment payment, or what would amount to the full sum for one half the time for the period covered by the annuity payments. They probably felt they could use the fund to better advantage than by keeping the securities. They undoubtedly did not bury it in a napkin like the unjust steward. In other words, they had and will have the use of the money during the intervening period.

It is a generally recognized rule that in reducing future payments to a present value there should be a discount in the amount of the payments to account for the intervening use of the money. That was an integral amount of taxpayers' gain on the immediate sale of the major portion of the securities. They did not pay interest. They traded the possible dividends plus the value of the securities for the right to make a loan and collect interest, or make other use, if they felt they could do better, with the cash proceeds of the sale.

The tax laws are complex because of the vast and complicated business developed by the genius, industry, and inventive skill of the American people. Many efforts have been made to simplify the internal revenue laws, but no reasonable man wants to restrict or hamstring the accomplishments of the men and women on whose shoulders rests the commerce of this country.

In addition to corporations, there are vast numbers of individual taxpayers.

4. Corbett Investment Co. v. Helvering, 64 App.D.C. 121, 75 F.2d 525 (1935); Autenreith v. Commissioner of Internal Revenue, 115 F.2d 856 (3d Cir. 1940); Kaufman's, Inc., 28 T.C. 1179 (1957); Steinbach Kresge Co. v. Sturgess, 33 F.Supp. 897 (D.N.J.1940); Rhinehart Farms, Inc. v. United States, 3 A.F.T.R.2d 483 (S.D. Iowa 1958); Edwards v. Commissioner of Internal Revenue, 102 F.2d 757 (10th Cir. 1939); Scott v. Commissioner of Internal Revenue, 29 F.2d 472 (7th Cir. 1928); Klein v. Commissioner of Internal Revenue, 84 F.2d 310 (7th Cir. 1936); Butterworth v. Commissioner, 23 B.T.A. 838 (1931).

5. See F. A. Gillespie & Sons Co. v. Commissioner of Internal Revenue, 154 F.2d 913 (10th Cir), cert. denied, 329 U.S. 781, 67 S.Ct. 204, 91 L.Ed. 670 (1946); Steinbach Kresge Co. v. Sturgess, supra note 4; Kaufman's, Inc., supra note 4; Reliable Incubator and Brooder Co., 6 T.C. 919 (1946); Edwin M. Klein, 31 B.T.A. 910 (1934), aff'd, 84 F.2d 310 (7th Cir. 1936).

These are of necessity treated on an individual basis. There is some overlapping, some hardship cases, but every effort is being made to work the various taxes out on as fair a basis as possible. One look at the extensive revenue laws, and a glance at the volumes of hearings before the Ways and Means Committee, will reveal the magnitude of the task of those who write these laws.

### Section 72

Under Section 72(a), all amounts received as an annuity must be included in gross income. However, § 72(b) provides that the annuitant is entitled to exclude that part of his payment "which bears the same ratio to such amount as the investment in the contract * * * bears to the expected return under the contract * * *." This ratio is called the exclusion ratio.

Under the ratio treatment Mrs. Dix would be entitled to exclude all but $6,-344.94 of each annuity payment and would be required to pay an income tax only on the latter amount of each payment.

It can be argued that, in the instant case, the taxpayers should be entitled to a deduction corresponding to the deduction which is allowed in the income payments under § 72(a) and that since it arises from the same contract it would be inconsistent to hold otherwise.

The short answer is that the Code does not so provide. Each taxpayer is a separate entity. The Internal Revenue Code covers thousands of items. There are millions of taxpayers. What is a taxable item in one man's hands may be exempt in another's, depending on age, status and many other conditions.

Special deductions are allowed taxpayers when they reach 65 years of age. Certain additional concessions are allowed as deductions after 72 years of age. The policy is set by the Congress. Many problems arise. It is not an easy task to collect billions of dollars of essential taxes from individuals who have no spe-

cial pleasure in paying taxes even though they recognize taxes are necessary in carrying out the purposes of free government.

Taxes are not a matter of mere machine-like logic. There is a human equation in taxation as in all the affairs of life. Taxes are levied on the successful individual to make temporary payments to the unsuccessful and his dependents even though they may all be individuals in good health. There is usually a reason behind all these different treatments.

The same principle is evident in other affairs of government. In drafting young men, students are deferred, those with dependents are deferred or called only as necessity arises. They may all be individuals in good health, but in this as in tax matters, the human element is involved. An educated, informed citizenship is essential to the maintenance of free government.

There has been a great deal of discussion in the Congress on whether all pensions, all retirement pay, all payments of a similar character to citizens beyond 65 years of age should be completely exempted from income taxes. As a rule such recipients are not in competition with active business life. Some of these payments have been exempted in whole or in part by statute while others have not.

Janet Dix was 79 years of age. The taxpayers were younger and engaged in active business or in a position to be so engaged. Mrs. Dix naturally wanted to be relieved of the burdens and irritations of managing her affairs. She wanted to be assured of a regular income sufficient to meet her living, medical and any hospital needs. Taxpayers were willing to assume those burdens and irritations. To all intents and purposes it was an arm's-length, business transaction.

The decision of the Tax Court of the United States is affirmed.

Affirmed.