ESTATE OF LLOYD G. BELL, DECEASED, WILLIAM BELL, EXECUTOR, AND GRACE BELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8176–71. Filed June 26, 1973.

470

*Donald D. Lamp*, for the petitioners.

*Thomas N. Tomashek*, for the respondent.

QUEALY, *Judge:* Respondent determined the following deficiencies in petitioners' income tax:

| Year | Deficiency |
|------|-----------|
| 1968 | $1, 931. 91 |
| 1969 | 2, 926. 11 |

Some of the facts have been stipulated by the parties and are incorporated herein by reference. As a result of concessions made by the parties, the following issues remain for decision:

(1) The determination of petitioners' "investment in the contract" in the years 1968 and 1969 for purposes of the exclusion ratio provided for under section 72(b); [1]

(2) To the extent that petitioners' "investment in the contract" exceeds their adjusted basis of the stock transferred, the manner of accounting for such excess.

An adjustment to petitioners' medical deduction for 1968 and 1969 is also involved, but is dependent on the outcome of the issues presented.

### FINDINGS OF FACT

Petitioners are the Estate of Lloyd G. Bell, deceased, William Bell as executor, and Grace Bell, the surviving spouse of Lloyd G. Bell. The legal residence of petitioners at the time of the filing of the petition was Rockford, Wash.

Lloyd and Grace Bell filed timely joint Federal income tax returns for the calendar years 1968 and 1969 with the Western Service Center of the Internal Revenue Service at Ogden, Utah. Lloyd Bell died on September 8, 1970.

Pursuant to an "Annuity Agreement" dated December 6, 1967, Lloyd and Grace Bell transferred community property consisting of 822½ shares of Bell & Bell, Inc., capital stock and 2,034 shares of Bitterroot, Inc., capital stock to William and Beverly Bell and Calvin A. and Betty Bell Reinertson in exchange for a promise by the transferees to pay them $1,000 per month for so long as either shall live. The stock was placed in escrow as security for the promise of the

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

transferees. As further security, the agreement provided for a cognovit judgment against the transferees in the event of a default. William Bell and Betty Bell Reinertson are the son and daughter, respectively, of Lloyd and Grace Bell.

Bell & Bell, Inc., and Bitterroot, Inc., are both closely held farming corporations. Neither is traded on a stock exchange. Both corporations were formed in 1965 by Lloyd Bell and his son, William Bell, as successors to an informal partnership carried on between father and son.

Lloyd Bell owned one-third of the stock of Bell & Bell, Inc., and two-thirds of the stock of Bitterroot, Inc. William Bell owned the balance of the stock in these corporations.

At the time of the transfer, Lloyd and Grace Bell's basis in the stock of Bell & Bell, Inc., was $9,559.94, and the basis of their stock in Bitterroot, Inc., was $11,497.63, or a total of $21,057.57. The total fair market value of such stock was $207,600.

Lloyd Bell was 72 years of age and Grace Bell was 68 years of age at the time of transfer. They had a joint life expectancy of 18.7 years. The expected return from the annuity, based upon such life expectancy, was $224,400. The discounted value of the annuity at the time of the transfer was stipulated to be either $142,573 or $126,200.38, depending upon whether the Court finds the correct method of valuation to be the representative cost of a comparable commercial annuity, as petitioners contend, or the tables under section 20.2031–7, Estate Tax Regs., as respondent contends.

Pursuant to the "Annuity Agreement" of December 6, 1967, Lloyd and Grace Bell received payments totaling $13,000 during 1968 and $12,000 during 1969.

OPINION

Lloyd Bell and his son, William Bell, formed and operated two closely held farming corporations. Lloyd Bell owned two-thirds of the stock of one and one-third of the stock of the other. His son owned the balance. Pursuant to an "Annuity Agreement" executed December 6, 1967, Lloyd and Grace Bell transferred all their stock in these corporations, owned as community property, to their son and daughter and their respective spouses in exchange for their promise to pay them $1,000 per month for so long as either shall live. The stock transferred was placed in escrow to secure the promise of the transferees. As further security, the agreement provided for a cognovit judgment against the transferees in the event of default. Lloyd and Grace Bell received payments of $13,000 and $12,000, respectively, in the taxable years 1968 and 1969.

The rules for the inclusion in income of said payments are prescribed in section 72. Insofar as material herein, that section provides:

## SEC. 72. ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

(a) GENERAL RULES FOR ANNUITIES.—Except as otherwise provided in this chapter, gross income includes any amount received as an annuity (whether for a period certain or during one or more lives) under an annuity, endowment, or life insurance contract.

(b) EXCLUSION RATIO.—Gross income does not include that part of any amount received as an annuity under an annuity, endowment, or life insurance contract which bears the same ratio to such amount as the investment in the contract (as of the annuity starting date) bears to the expected return under the contract (as of such date). * * *

(c) DEFINITIONS.—

(1) INVESTMENT IN THE CONTRACT.—For purposes of subsection (b), the investment in the contract as of the annuity starting date is—

(A) the aggregate amount of premiums or other consideration paid for the contract, minus

(B) the aggregate amount received under the contract before such date, to the extent that such amount was excludable from gross income under this subtitle or prior income tax laws.

The respondent argues that petitioners' "investment in the contract," as defined in section 72(c), is petitioners' adjusted basis for the stock transferred in consideration of the transferees' promise of an annuity. Rev. Rul. 69–74, 1969–1 C.B. 43. The petitioners argue that their investment in the contract" is the fair market value of the stock transferred, relying on Rev. Rul. 239, 1953–2 C.B. 53, which applied to a similar computation under section 22(b)(2) of the Revenue Act of 1939. Petitioners further contend that the fair market value of the stock was not less than $207,600.

In our opinion, we need not pass on the applicability of either Rev. Rul. 239 or Rev. Rul. 69–74, *supra*, since both involve "unsecured" private annuities.[2] Here, we are dealing with an annuity which is amply secured, not only by the property transferred, but also by a cognovit judgment that would subject all the property of the transferees to attachment without court proceedings.

Section 72(c)(1) defines "investment in the contract" as "the aggregate amount of premiums or other consideration paid for the contract." Section 22(b)(2) of the 1934, 1936, and 1939 Revenue Acts, predecessors to section 72, contained similar language.[3] Under such

---

[2] In fact, some commentators define a "private annuity" as a "transfer of property to a transferee (obligor), who has not from time to time written annuities, in consideration of the transferee's unsecured promise to make periodic payments of money, for a specified time, to the transferor of the property (annuitant)." Raiborn & Watkins, "Critical Analysis of Private Annuity Taxation," 50 Taxes 11 (1972).

[3] Sec. 22(b)(2), 1939 Code, provided, in pertinent part, as follows:

Amounts received as an annuity under an annuity or endowment contract shall be included in gross income; except that there shall be excluded from gross income the excess of the amount received in the taxable year over an amount equal to 3 per centum of the aggregate premiums or consideration paid for such annuity (whether or not paid during such year), until the aggregate amount excluded from gross income under this chapter or prior income tax laws in respect of such annuity equals the aggregate premiums or consideration paid for such annuity. * * *

Acts, this language has uniformly been construed to mean the amount required to purchase the annuity, which in an arm's-length transfer, is the fair market value of the property transferred. *F. A. Gillespie*, 38 B.T.A. 673 (1938); *Hill's Estate* v. *Maloney*, 58 F. Supp. 164 (D. N.J. 1944); *Jane J. de Canizares*, 32 T.C. 345 (1959). Nothing in the statute, the legislative history, or the regulations interpreting section 72 indicates that "consideration paid" on our facts should have a different meaning than it had under section 22(b)(2) of the prior Acts. Here the consideration paid consisted of stock of two closely held farming corporations having an aggregate fair market value of $207,600.

In determining the "consideration paid," however, the statute presupposes a transaction between unrelated parties dealing at arm's length. The petitioners claim that the consideration paid for the annuity amounted to $207,600, while at the same time petitioners concede that the discounted value or cost of a commercial annuity providing for the same payments was $142,573. We can only account for such excess as being attributed to the family relationship between the annuitants and the transferees. Such excess, therefore, whether predicated upon the cost of a commercial annuity, as contended for by the petitioners, or upon the annuity tables under section 20.2031–7(f), Estate Tax Regs., as contended for by the respondent, must be deemed to be a gift. In *Commissioner* v. *Wemyss*, 324 U.S. 303, 306 (1945), the Supreme Court makes this clear:

Congress chose not to require an ascertainment of what too often is an elusive state of mind. For purposes of the gift tax it not only dispensed with the test of "donative intent." It formulated a much more workable external test, that where "property is transferred for less than an adequate and full consideration in money or money's worth," the excess in such money value "shall for the purpose of the tax imposed by this title, be deemed a gift * * *." * * * [Sec. 2512(b).]

See also *Anna L. Raymond*, 40 B.T.A. 244 (1939), affd. 114 F. 2d 140 (C.A. 7, 1940); *Maud Gillespie*, 43 B.T.A. 399 (1941), reversed on other grounds 128 F. 2d 140 (C.A. 9, 1942); *Bowden* v. *Commissioner*, 234 F. 2d 937 (C.A. 5, 1956).

Our determination that the transfer was a partial gift is further buttressed by the fact that the annuitants did not seek to ascertain the price at which they could have purchased a similar annuity from an insurance company. Nor did the transferees investigate whether the obligation, which they were assuming, was more or less than the value of property received. Their concern was merely whether they could pay the required monthly amounts. The consideration paid for the annuity under these circumstances, therefore, is limited to the commuted value of the annuity contract irrespective of the fair market value of the property transferred.

The parties further disagree on the correct method of valuing the annuity. Petitioners have valued it at $142,573, using the representative

cost of a comparable commercial annuity. Respondent, on the other hand, has valued it at $126,200.38, using the Table I under section 20.2031–7(f), Estate Tax Regs., as provided by section 1.101–2(e)(1) (iii) (*b*) (*3*), Income Tax Regs.

Respondent's determinations are presumptively correct. To overturn his use of the estate tax tables, petitioners must prove that their use under the circumstances is arbitrary and unreasonable. *John C. W. Dix*, 46 T.C. 796 (1966), affd. 392 F. 2d 313 (C.A. 4, 1968).

Petitioners object to the actuarial table used by respondent because it is based on the life expectancies of the general population in 1939–41, which does not reflect the longer longevity of the population in 1967, the year of the transfer. Nor does it provide separate tables for men and women, experience indicating that the latter live longer.

Petitioners contend that the cost of a comparable commercial annuity would be a more correct indication of the value of the transferees' promise. Respondent, however, has presented an expert witness who testified that the rates charged by commercial life insurance companies are affected by factors not present in private annuity transfers. For instance, the commercial price contains a "loading factor" for anticipated expenses and expected profits. Commercial annuitants, as a self-selected class, have a longer life span than the general population. These factors operate to increase the cost of a commercial annuity. So does the fact that commercial companies, being regulated by the State, are restricted in their investments and required to maintain sufficient reserves to assure annuity payments can be made. All these factors have been recognized in prior cases which have rejected using the cost of a commercial annuity to value a private annuity. *John C. W. Dix, supra; McMurtry* v. *Commissioner*, 203 F. 2d 659 (C.A. 1, 1953) ; *Estate of Abraham Koshland*, 11 T.C. 904 (1948), affd. 177 F. 2d 851 (C.A. 9, 1949) ; *Estate of Koert Bartman*, 10 T.C. 1073 (1948) ; *Estelle May Affelder*, 7 T.C. 1190 (1946).

The petitioners have presented no evidence to show that the longer life expectancy of commercial annuitants should be attributed to the annuitants in this case, Lloyd and Grace Bell. Indeed, the record indicates that Lloyd Bell died less than 3 years after the transfer. The fact that the table used by the respondent does not distinguish between males and females is of itself not sufficient to prove the use of such tables was arbitrary and unreasonable. *John C. W. Dix, supra.*

On the basis of the evidence presented, the petitioners have failed to show that respondent's use of the table under section 20.2031–7(f), Estate Tax Regs., to value the annuity promise of the transferees was arbitrary and unreasonable. We therefore adopt the respondent's determination of $126,200.38 as the value of the annuity promise at the time of transfer.

Finally, having determined that the consideration paid by the petitioners for the annuity within the meaning of section 72(c) amounted to $126,200.38, the petitioners must likewise be deemed to have realized a taxable gain on the transfer, measured by the difference between petitioners' adjusted basis in the stock and the fair market value of the annuity.

Petitioners argue that they should be able to use the cost recovery approach of *J. Darsie Lloyd*, 33 B.T.A. 903 (1936), before having to report any gain since the value of the promise received is too contingent to be valued for purposes of section 1001. See also *Frank C. Deering*, 40 B.T.A. 984 (1939) ; *Hill's Estate* v. *Maloney, supra; Commissioner* v. *Kann's Estate*, 174 F. 2d 357 (C.A. 3, 1949).

We think that petitioners' reliance on *Lloyd* is misplaced. That case involved the transfer of certain appreciated stock by a father in exchange for his son's unsecured promise to make certain annuity payments to him for life. In permitting the father to recover his basis first before having to report any capital gain, the Court held that the son's promise was too contingent to value for purposes of section 111(c) (now 1001) due to "the uncertainty as to whether or not the one agreeing to make payments will be able to make them as agreed when the time for payment actually arrives." Cf. *Burnet* v. *Logan*, 283 U.S. 404 (1931).

The facts in this case are clearly distinguishable from *Lloyd* and the cases cited by petitioners. Both petitioners and respondent have elected to treat the exchange of stock for an annuity as a viable transaction for income tax purposes. The annuity was amply secured not only by the stock transferred but also by an agreement providing for a cognovit judgment against the transferees in the event of a default. It was agreed that the stock transferred by Lloyd and Grace Bell had a value of $207,600. It was further agreed that the annuity promise received in return had a substantial value, ranging from $126,200.38, as contended by respondent, to $142,573, as contended by petitioners. This Court has sustained the respondent's determination with respect to that value.

We thus have a transfer of stock in exchange for a consideration, subject only to a lien to secure payment thereof. Under the laws of the State of Washington, as well as prevailing tax law, this constituted a completed sale. *Low* v. *Colby*, 137 Wash. 476, 243 P. 18 (1926) ; *Rockwood* v. *Green*, 179 Wash. 138, 36 P. 2d 61 (1934) ; cf. Uniform Commercial Code—Sales, Wash. Rev. Code sec. 62A.2–401 (effective July 1, 1967) ;[4] *Pacific Coast Music Jobbers, Inc.*, 55 T.C. 866 (1971).

---

[4] Although sales of stock are excluded from the operation of sec. 62A.2, Uniform Commercial Code—Sales, Wash. Rev. Code (effective July 1, 1967), there is authority for applying its rules by analogy. *Agar* v. *Orda*, 264 N.Y. 248, 190 N.E. 479 (1934), where the Uniform Sales Act, the predecessor to sec. 62A.2, *supra*, was extended to the sale of stock. See also *Corwin* v. *Grays Harbor Washingtonian*, 151 Wash. 585, 276 P. 902 (1929). In any event, the result reached under the statute on our facts is the same as under common law.

In fact, except for the uncertainty as to the ultimate amount payable under the contract, it is no different than any other installment sale. The actuarial tables provide a recognized basis for determining the value of the consideration received notwithstanding such uncertainty. *John C. W. Dix, supra.* Under such circumstances, we find no grounds for the application of the cost recovery rule in *Burnet* v. *Logan, supra.*

It would be manifestly inconsistent to find that the annuity contract had a fair market value for purposes of determining a taxpayer's cost or investment in the contract under section 72(c), and yet to hold it had no determinable value for purposes of section 1001.

Since the transfer occurred prior to the taxable years before the Court, no part of the amounts received are taxable as gain realized during the years before the Court.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

SIMPSON, *J.*, dissenting: I must dissent from the majority opinion with respect to its holding that the gain resulting from the exchange of the stock for the private annuity was taxable in the year of the exchange. Such conclusion was not sought by the respondent. Although the majority opinion results in no part of the gain on the exchange being taxable in 1968 and 1969, it may ultimately result in the petitioners having a larger tax burden than that contended for by the respondent. If section 1311, I.R.C. 1954, is applicable, as may be the case, the entire gain of $105,142.81 will be taxable to the petitioners in 1967; whereas, under the respondent's approach, none of the gain would be taxable in that year, but a portion of each annuity payment would be treated as capital gain until the entire gain is reported. See Rev. Rul. 69-74, 1969-1 C.B. 43.

The opinion states in part:

It would be manifestly inconsistent to find that the annuity contract had a fair market value for purposes of determining a taxpayer's cost or investment in the contract under section 72(c), and yet to hold it had no determinable value for purposes of section 1001.

Such statement implies that the actuarial value of an annuity constitutes its fair market value in all cases, whether or not there is security for the performance of the obligation. Such statement ignores the long-established position of this Court. *Frank C. Deering,* 40 B.T.A. 984 (1939); *J. Darsie Lloyd,* 33 B.T.A. 903 (1936); see *Commissioner* v. *Kann's Estate,* 174 F. 2d 357 (C.A. 3, 1949), affirming a Memorandum Opinion of this Court; *Bella Hommel,* 7 T.C. 992 (1946). In *J. Darsie Lloyd,* 33 B.T.A. at 905, this Court held that the transfer of property to an individual, in consideration for an unsecured promise to pay an annuity, did not require the reporting of gain in the year of the transfer because of "the uncertainty as to whether

or not the one agreeing to make payments will be able to make them as agreed when the time for payment actually arrives." The Court found that the annuity had no fair market value even though the application of the tables would have rendered an actuarial value. We have found no cases which deviate from such holding where a private, unsecured annuity was involved.

The security present in this case may provide a basis for distinguishing *Lloyd*, but it should not result in gain being reported on the transfer of the stock for the private annuity. This Court has held many times that a cash method taxpayer does not include in the computation of the "amount realized" under section 1001(b) the right to receive future income unless that right is readily transferable in commerce. *Western Oaks Building Corp.*, 49 T.C. 365 (1968); *Estate of Coid Hurlburt*, 25 T.C. 1286 (1956); *Curtis R. Andrews*, 23 T.C. 1026 (1955); *Estate of Clarence W. Ennis*, 23 T.C. 799 (1955); *Nina J. Ennis*, 17 T.C. 465 (1951); *Harold W. Johnston*, 14 T.C. 560 (1950); see *John B. Atkins et al.*, 9 B.T.A. 140 (1927). In determining whether a right is readily transferable in commerce, this Court has examined such factors as whether the right had a "readily realizable market value" (*John B. Atkins et al.*, *supra* at 151), whether it was "freely and easily negotiable" (*Nina J. Ennis*, *supra* at 470), and whether it was of the type that "commonly change[s] hands in commerce" (*Harold W. Johnston*, *supra* at 565). If a right to receive future income is found to be readily transferable in commerce, it is often referred to as the "equivalent of cash." *Western Oaks Building Corp.*, *supra* at 376; *Nina J. Ennis*, *supra* at 470; *John B. Atkins et al.*, *supra* at 151. The issue in these cases is significantly different from that involved in such cases as *Stephen H. Dorsey*, 49 T.C. 606, 634 (1968) (Simpson, *J.*, dissenting), and *Charles Wilson*, 39 T.C. 362 (1962).

The peculiar characteristics of a private annuity require a finding that the right to receive income during a person's life is not ordinarily a right which is readily transferable in commerce. The span of each person's life is so speculative that it is impossible to determine with any degree of certainty the number of annuity payments that will be made prior to the annuitant's death. Actuarial estimates may be accurate in the macrocosm where the margin of error in forecasting one life will be offset by the margin in forecasting other lives. However, if a taxpayer is considering the purchase of an annuity on another's life, there is no margin of error to offset the extremely speculative nature of the lifespan. See Mancina, "The Private Annuity," 43 Taxes 255, 258–259 (1965); Note, "Private Annuities: Revenue Ruling 69–74—Its Significance, Effect, and Validity," 23 Vand. L. Rev. 675, 688 fn. 77 (1970). For example, in this case, although the expected return on the private annuity was $224,400, there was no obligation to pay that amount. In fact, it was almost certain that the annuitants would re-

ceive, not that amount, but more or less than that amount. A right as speculative as a life annuity, or, in this case, a joint annuity for two lives, cannot be said to have a readily realizable market value or to be freely and easily negotiable or to be of the type that commonly changes hands in commerce. Indeed, in 1954, Congress rejected a proposal to tax the gain on the exchange of property for a private annuity in the year of the exchange. S. Rept. No. 1622. 83d Cong., 2d Sess., p. 116 (1954).

The question remains of how the gain on the transfer of property for a secured private annuity should be treated within the framework of the present law. Under pre-1954 law, Congress adopted a 3-percent formula in taxing annuities. As explained by the Senate Finance Committee, the rule taxed an annuitant on the annuity payments he received to the extent of 3 percent of the amount paid for the annuity. Any payments he received above this amount were considered to be the return of his capital and were excluded from tax until the total amount excluded equaled the amount he paid for the annuity. Thereafter, the annuity payments were taxable in whole. S. Rept. No. 1622, *supra* at p. 11. Section 72 was enacted because the 3-percent rule was erratic. After the annuitant recovered his investment, the rule could lead to a situation in which:

the annuitant finds that after being retired for a few years and becoming accustomed to living on a certain amount of income after tax, he suddenly has to make a sizable downward adjustment in his living standard because, when his exclusion is used up, the annuity income becomes fully taxable. [S. Rept. No. 1622, *supra* at p. 11.]

Congress intended to eliminate this difficulty by enacting section 72, under which there is a proration of the cost of the annuity—a portion of each annuity payment is treated as annuity income, and the balance is treated as a return of cost. The treatment of the gain from the transfer of the property for an annuity should, insofar as possible, be in accord with this legislative treatment of annuities.

I agree with the majority that the investment in the contract for the purposes of section 72 is, in this case, equal to the actuarial value of the annuity, and, in this respect, I would reject Rev. Rul. 69–74, 1969–1 C.B. 43. The investment in the contract is the fair market value of the stock exchanged for the annuity, and in view of the family relationship in this case and the fact that a gift was obviously made as to a portion of the stock, it is reasonable to conclude that the amount of stock exchanged for the annuity is equal to the value of the annuity. Thus, stock worth $126,200.38 was paid for the annuity.

Section 72(b) provides that gross income does not include that part of any amount received as an annuity which bears the same ratio to such amounts as the investment in the contract bears to the expected return under the contract. Hence, the exclusion ratio in this case is

$126,200/$224,400 or approximately 56 percent. Of each annuity payment of $1,000, approximately $437.62 is includable under section 72 as annuity income, and the remaining $562.38 is not taxable under section 72. However, in this case, a gain of $105,142.81 has been realized on the exchange of the stock for the annuity, and there is no indication that by the enactment of section 72(b), Congress intended for any such gain to be excluded from taxation. Such provision was designed to exempt that portion of the annuity payment from taxation under section 72 which was a return of cost, but since the annuity payments also constitute payment for the stock exchanged for the annuity, a part of each payment must be treated as taxable gain. Cf. *Hill's Estate* v. *Maloney*, 58 F. Supp. 164 (D. N.J. 1944).

If the rule of *Burnet* v. *Logan*, 283 U.S. 404 (1931), were adopted, approximately $562.38 of each annuity payment would be excluded until the recovery of the petitioners' entire basis in the stock of $21,057.57. After the recovery of basis, then such portion would be wholly taxable as capital gain, until the $105,142.81 of gain was all reported. Such an approach is manifestly inconsistent with the objective of section 72; whereas, an approach which prorates the capital gains would be consistent with the approach taken by that section. Under the latter approach, the gain resulting from the exchange of the stock for the annuity would be divided by the life expectancy of the annuitant at the time of the exchange; that is, the gain of $105,142.81 would be divided by Mr. and Mrs. Bell's joint life expectancy of 18.7 years. Each year the portion of the gain allocable to the annuity payments received in that year would be subjected to taxation. If the annuitant lived less than his life expectancy and received less than expected, only a part of the estimated gain would be taxable. When the entire gain is reported, no additional amounts would be taxable as gain. The American Law Institute proposed in 1953 that the portion of each annuity payment allocable to the gain on the exchange should be treated as capital gain, however long the annuitant lived, but that approach would require legislation. See 1 ALI Fed. Income Tax Stat. sec. X126 (Feb. 1954); Andro, "Non-Commercial Annuities—Income Tax Consequences to the Transferor Who Exchanges Property in Return for an Annuity," 9 Tax L. Rev. 85, 89 (1953); Ross, "The Private Annuity as a Tax Minimizing Instrument," 41 Taxes 199, 204–206 (1963).

Under my suggested approach, Mr. and Mrs. Bell would treat each $1,000 monthly payment as follows: Approximately $437.62 as ordinary income, approximately $468.54 as capital gain income, and approximately $93.84 as excludable from income. If Mrs. Bell lives beyond the joint life expectancy of herself and Mr. Bell, the capital gain will not be reportable thereafter, and she can exclude approximately $562.38 of each payment. The $437.62 will continue to be taxable as ordinary income.

The suggested approach does not necessarily require that a similar approach be used in the case of a commercial annuity, where such other factors as cash surrender value and guaranteed benefits might be involved. Moreover, a commercial annuity is usually purchased for cash, and the question of how to tax gain resulting from a transfer of property for a commercial annuity would not arise in such a situation.

DRENNEN, DAWSON, TANNENWALD, HALL, and WILES, *JJ.*, agree with this dissent.