KAUFMAN'S, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57540.   Filed September 19, 1957.

*L. William Seidman, Esq., Albert B. Doherty, III, Esq.*, and *Lawrence J. Seidman, C. P. A.*, for the petitioner.
*J. Bruce Donaldson, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined a deficiency in petitioner's income tax for the fiscal year ended January 31, 1950, in the amount of $2,710.59. The issues are (a) whether certain annuity payments made by petitioner are deductible as interest or loss, or whether they are capital expenditures paid for the acquisition of property; and (b) the determination of various factors involved in calculating depreciation for the fiscal year in question on the building in which petitioner conducted its business.

### FINDINGS OF FACT.

Most of the facts have been stipulated either orally or in writing. The stipulated facts are incorporated herein by this reference.

Petitioner, a corporation organized under the laws of the State of Illinois on June 24, 1946, operates a retail department store business in Champaign, Illinois. Petitioner employs an accrual method of accounting. It keeps its books and reports its income on a fiscal year basis ending January 31. For its fiscal year ended January 31, 1950, petitioner filed its Federal income tax return with the collector of internal revenue for the eighth district of Illinois. On this return petitioner deducted payments to Hattie Kaufman aggregating $4,800, which deductions were disallowed by respondent.

Prior to 1935, Stanley L. Kaufman, as sole proprietor, had been engaged in a retail department store business in Champaign, Illinois. The store was located in a building at 16–18 Main Street. Hattie F. Kaufman, Stanley's mother, was the owner in fee simple of the land and the building in which the business was being carried on.

Hattie Kaufman had purchased the land and building on June 26, 1923, for $90,000, allocable $14,000 to land and $76,000 to building. Hattie allocated $76,000 as cost of the building. The estimated life of the building for depreciation purposes at the time Hattie acquired it was 40½ years.

On December 20, 1935, Hattie Kaufman transferred to Stanley Kaufman, by warranty deed, her title in the land and building at 16–18 Main Street. The consideration recited in the deed was $40,627.78, and love and affection. On the same date Stanley and his mother entered into a contract which reads in material part as follows:

## ANNUITY AGREEMENT

This agreement by and betweeen Hattie F. Kaufman, hereinafter referred to as First Party, and Stanley L. Kaufman, hereinafter referred to as Second Party, both of Champaign, Illinois, Witnesseth that,

WHEREAS, the First Party is desirous of selling the property hereinafter described to Second Party for the consideration and upon the terms hereinafter set forth, and

WHEREAS, the Second Party is desirous of purchasing said property for the consideration and upon the terms hereinafter set forth.

Now THEREFORE, the following covenants are made in mutual consideration of each other.

1. First Party covenants and agrees to deliver, coincident with the execution of this agreement, a warranty deed to Second Party to the following described property:

[Herein follows a description of the property.]

conveying a good and merchantable title thereto, together with an abstract of title thereto, said title to be free and clear of all encumbrances except taxes for 1935 payable in 1936.

2. Second Party covenants and agrees to pay First Party therefor the sum of Four Hundred Dollars ($400.00) per month on the first day of each and every calendar month hereafter, commencing January 1, 1936 for and during the natural life of First Party, together with interest at the rate of five percent (5%) per annum from the date said payments are due until paid, provided that upon the death of First Party all payments hereunder shall cease and this agreement shall be fully satisfied, if all payments have been made during the lifetime of First Party.

\* \* \* \* \* \* \*

4. Second Party covenants and agrees to deliver coincident with the execution of this agreement a mortgage in due form and properly executed to secure the payments agreed to be made in paragraph two of this agreement.

First Party hereby authorizes her Administrator, Executor or other personal representative to satisfy and discharge all liability of Second Party upon this contract and to release the mortgage mentioned in paragraph four of this agreement in the event that all payments hereinabove agreed to be made have been duly paid during the lifetime of First Party or if any payments remaining due at the time of her death are paid into her estate.

The mortgage referred to in the agreement was duly executed and provided in part that "the whole indebtedness" would become due and the mortgage could be foreclosed at the option of the mortgagee if default occurred in any terms of the mortgage or the annuity contract.

The parties have stipulated that the value of Hattie's right to receive $400 per month, commencing on January 1, 1936, and continuing for the remainder of Hattie's life expectancy, was $40,627.78. The fair market value of the land and building on December 20, 1935, the date of transfer, was $57,800. Of this amount, $37,800 represented the value of the building and $20,000 represented the value of the land. The difference between the fair market value of the land and building ($57,800) and the discounted value of the annuity ($40,-

627.78) was made the subject of a gift from Hattie to Stanley, for which Hattie filed a gift tax return.

During the period from January 1, 1936, to June 30, 1946, pursuant to the terms of the agreement, Stanley made payments to his mother aggregating $50,000. On his Federal income tax returns for this period Stanley claimed and was allowed as interest deductions a portion of said payments, aggregating for the period $10,736.54. Depreciation deductions for the building were claimed and allowed in an amount aggregating $14,700.02, (using as a cost basis the fair market value of the building as of December 20, 1935).

Stanley incorporated the business as of July 1, 1946, transferring its assets to petitioner. In exchange therefor, petitioner assumed the liabilities of the sole proprietorship and issued to Stanley 750 shares of its $100-par-value common capital stock (which constituted all of petitioner's then issued capital stock). Included among the assets transferred to petitioner were the land and building located at 16–18 Main Street, subject to the mortgage in favor of Hattie Kaufman. Included among the liabilities assumed was the annuity contract obligation.

From the date of petitioner's incorporation to January 31, 1950, the end of the taxable year here in question, the sole outstanding common stock of petitioner consisted of 750 shares of $100-par-value common stock owned by Stanley Kaufman. The only other capital stock outstanding were 100 shares of $100 preferred stock issued to Stanley's daughter during the fiscal years 1948 and 1949, for which par value was paid.

For the period July 1, 1946, to January 31, 1949, petitioner paid Hattie $12,400 pursuant to the obligation created by the annuity contract which was assumed by petitioner when incorporated. On its Federal income tax returns for said period, the corporation claimed and was allowed as an interest deduction a portion of the payments made to Hattie Kaufman, aggregating $5,754.91. Deductions for depreciation on the building at 16–18 Main Street were claimed and allowed in the amount of $3,616.65 (using as a cost basis $37,800, the fair market value of the building as of December 20, 1935).

On petitioner's books and records, as of January 31, 1949, the building is shown to have a cost basis of $37,800 and the reserve for depreciation is shown to be $18,316.67. In petitioner's tax return for the fiscal year ended January 31, 1949, the building is shown to have a cost basis of $37,800 and the reserve for depreciation is shown as $18,316.67 as of January 31, 1948.

At all times material hereto, the building had a useful life ending on December 31, 1963. The parties have stipulated that the depre-

ciation allowable in years prior to fiscal 1950 did not exceed the depreciation taken by petitioner and Stanley.

During its fiscal year ended January 31, 1950, the year here in question, petitioner paid and deducted $4,800 as payments made to Hattie Kaufman pursuant to its assumed obligation under the annuity contract. In the same year, petitioner deducted $1,400 as depreciation on the building.

### OPINION.

The first question to be decided is the propriety of respondent's disallowance as a deduction, either as interest expense or as a loss, of the $4,800 paid by petitioner to Hattie Kaufman during the fiscal year ending January 31, 1950, pursuant to the annuity agreement set forth in our Findings of Fact. It is clear that petitioner acquired the assets of Stanley's business, including the property in question, subject to the charge of the annuity, and that the payment of $4,800 had the same character to petitioner as like payments made by Stanley. *Estate of T. S. Martin*, 24 B. T. A. 862; *Corbett Investment Co. v. Helvering*, 75 F. 2d 525 (C. A., D. C., 1935), affirming a Memorandum Opinion of this Court. Respondent determined that the payment in question was a capital expenditure, and, therefore, not deductible, basing his determination on the premise that the terms of the annuity contract provided for the payments to be made for the purchase of the land and building, and that such payments, since they represent the purchase price of the property, are capital expenditures.

Petitioner challenges respondent's determination on the grounds that the facts here demonstrate that the parties intended the transaction to be closed at the time entered into, the same as if Stanley had paid Hattie cash for the property and Hattie had then purchased an annuity from Stanley with the cash received. In support of its position, petitioner argues that the parties were aware of the value of the property, the life expectancy of the annuitant, and the discounted value of the annuity at the time they entered into the transaction, and that the parties contracted on the basis of those values.

The burden of proof is, of course, upon the petitioner. We think it has failed to meet the burden, and that the affirmative evidence supports respondent's contention. Stanley testified that, in operating the store, it was to his advantage to own the property, and that such ownership was good from a business standpoint. He discussed the matter with his mother. Her desire was to make the sale possible. All she wanted was to be provided with the sum of $400 a month as long as she should live. She fixed upon this amount before she knew the calculated value of such payments. After the value of the payments was computed, both she and Stanley realized that

the fair market value of the property was in excess of the value of the annuity. Nevertheless, she did not in any way alter her requirements. Instead, in view of the many years Stanley had been in business, she wanted to and did make a gift to him of the difference.

There is thus nothing to indicate that the payments of $400 a month were gauged to the value of the property. Moreover, Stanley was not engaged in the business of writing annuity contracts nor was he selling an annuity as such. His desire was to acquire the property for his business. To accomplish this, he was satisfied to comply with his mother's requirements which were obviously modest in relation to the value of the property. She wished him to have the property subject only to her desire to be provided for to the extent of the monthly payments referred to above. She expressed no desire, and made no effort, to require or bargain for the payment of the fair market value of the property.

Under the circumstances, we take the view that the so-called annuity payments were on account of the purchase price of the property. Profit and loss to petitioner will normally arise upon disposition of the property, but not upon payment to Hattie of amounts in excess of the calculated value of the payments provided for in the agreement.

In *Citizens National Bank of Kirksville*, 42 B. T. A. 539 (1940), affd. 122 F. 2d 1011, certiorari denied 315 U. S. 822, we said (p. 544) :

Petitioner's second contention is that the monthly payments are deductible as an expense or loss. The argument advanced is that petitioner, in effect, wrote an annuity on the life of Frank Baird at $197.18 per month ($200 less average monthly insurance charges of $2.82) ; that by October 1933 the total monthly payments to Frank Baird equaled the value of the property acquired from him ; and that all subsequent payments constituted income to Frank Baird and an expense or loss to petitioner under the rule announced in *Commissioner* v. *Moore Corporation*, 42 Fed. (2d) 186, affirming 15 B. T. A. 1140.

The premise of this contention is that petitioner ventured into the field of annuity writing for profit or loss, that a loss resulted as to each payment made after October 1933, and that the total payments made during 1936 are deductible. If the premise be granted, the argument finds support in the cited case, but we cannot agree with the premise.

In our opinion petitioner was purchasing a capital asset, the right to possession of property ; it was not writing an annuity for profit. Frank Baird was given the possession and net income from the building for his lifetime. Petitioner had been the tenant of Frank Baird and his father before him for years. It was possession of the property which petitioner sought and the consideration therefor took the form of monthly payments. * * *

In affirming our opinion in *Citizens National Bank of Kirksville*, *supra*, the Court of Appeals said (p. 1015) :

[Taxpayer's] theory is purely fictitious and bears no actual relation to the transaction between the parties. The relation in this instance is entirely contractual. The bank bargained to purchase and Frank Baird to sell the right to the possession of the premises during the life of Baird. Nothing in the con-

tract relates to the market value nor to Baird's life expectancy. The parties were at liberty to pay and receive any price agreed upon whether more or less than market value. The amount agreed upon, although payable in installments contingent as to number during life, was a capital investment and is not deductible either as a business expense under § 23 (a) nor as a loss under § 23 (f) of the Act. * * * the payments by the very terms of the contract were for a capital asset and not for an annuity. * * *

In the instant case, also, the parties agreed to transfer the property in exchange for a stated sum per month for life. Although, as the evidence indicates, they became aware that the consideration agreed upon, when discounted to the date of transfer, was less than the fair market value of the property, Hattie made a gift of the excess value, illustrating that she was not concerned with receiving full value for her interest. From the record we can only conclude that the primary intention of the parties was that Hattie should be provided with $400 per month for life and that Stanley should receive the property. Neither the sale of an annuity by Stanley nor the purchase of an annuity by his mother was in contemplation. In essence, Stanley agreed to purchase that part of the property not conveyed by gift for whatever it would cost him under the annuity agreement. As a result, each payment was a capital expenditure and not deductible, either as interest expense or as a loss. In *D. Bruce Forrester*, 4 T. C. 907 (1945), we said (p. 915) :

The arrangement was simply an agreement to pay the amount without regard to cost. * * * Petitioner elected to obligate himself to pay the amount rather than purchase an annuity contract to relieve him of the liability and is bound by his choice of possible plans. * * *

Additional authorities supporting the above principles will be found in the footnote below.[1]

Petitioner relies upon *John C. Moore Corporation*, 15 B. T. A. 1140 (1929), affd. 42 F. 2d 186 (C. A. 2, 1930). The distinction between that case and the one before us is the same as that adverted to at some length in the quotation from our later opinion in *Citizens National Bank of Kirksville*, *supra*, and need not be repeated.

Petitioner further relies upon *Donald H. Sheridan*, 18 T. C. 381 (1952). In that case, however, the annuity agreement was entered into in consideration for the release of a mortgage, and not, as in the

[1] *Autenreith* v. *Commissioner,* 115 F. 2d 856 (C. A. 3, 1940), affirming 41 B. T. A. 319 ; *Edwards* v. *Commissioner,* 102 F. 2d 757 (C. A. 10, 1939), affirming 37 B. T. A. 1334 ; *Robert Hoe Estate Co.* v. *Commissioner,* 85 F. 2d 4 (C. A. 2, 1936), affirming 32 B. T. A. 903 ; *Klein* v. *Commissioner,* 84 F. 2d 310 (C. A. 7, 1936), affirming 31 B. T. A. 910 ; *Corbett Investment Co.* v. *Helvering,* 75 F. 2d 525 (C. A., D. C., 1935), affirming Memorandum Opinion of this Court ; *Scott* v. *Commissioner,* 29 F. 2d 472 (C. A. 7, 1928), affirming 9 B. T. A. 955 ; *Mastin* v. *Commissioner,* 28 F. 2d 748 (C. A. 8, 1928), affirming 7 B. T. A. 72 ; *Elliott R. Corbett,* 28 B. T. A. 46 (1933) ; *Estate of T. S. Martin,* 24 B. T. A. 862 (1931) ; *Victor J. Evans,* 23 B. T. A. 156 (1931) ; *Pacific Flush Tank Co.,* 17 B. T. A. 896 (1929) ; *O. R. Fuller,* 11 B. T. A. 1025 (1928) ; *Robert Lang, et al.,* 5 B. T. A. 438 (1926) ; *Steinbach Kresge Co.* v. *Sturgess,* 33 F. Supp. 897 (D. C., N. J., 1940).

instant case, as consideration for the purchase of property where the taxable transaction to the payor will normally occur upon disposition of the property. The procurement of the release of a mortgage in consideration for the payment of the annuity was, for all practical purposes, the same as the sale of an annuity for cash. It became a closed end transaction upon the execution of the release and the issuance of the annuity. In *Sheridan, supra,* no issue arose, and, of course, no consideration was given to the question of whether or not annuity payments paid for the acquisition of property were capital expenditures. There is no suggestion in the opinion of any intention to change or modify the rule in *Citizens National Bank of Kirksville, supra,* and other cases cited in footnote 1, and none of said cases were referred to in our opinion.

Petitioner contends further that to consider the payments in question as capital expenditures, which treatment is in accord with Revenue Ruling 119, 1955–1 C. B. 352, is inconsistent with the tax treatment to the annuitant of annuity payments received in exchange for property under Revenue Ruling 239, 1953–2 C. B. 53, and is therefore inequitable. The question of tax treatment to the annuitant is, of course, not before us. We think that Revenue Ruling 119 correctly states the law as it applies to the payor upon the facts of the instant case. A discussion of Revenue Ruling 239 in this respect would not be helpful. We need only add that any difference in treatment to the annuitant stems from the provisions of section 22 (b) (2) of the Internal Revenue Code of 1939 which is not applicable to the issue presented in the instant case.

On the basis of the foregoing discussion, we hold that the payments totaling $4,800 made by petitioner to Hattie during the taxable year in question were capital expenditures and were not deductible as losses or interest expense.

Respondent, in his statutory notice, disallowed depreciation on the building here involved in the amount of $314.30. Respondent takes the position, on this issue, that petitioner has failed to establish any basis or adjusted basis with respect to that part of the building acquired by Stanley as a gift from Hattie. We have found as facts that Hattie purchased the property on June 26, 1923, for $90,000; that $14,000 of the purchase price was allocated to land and $76,000 to building; and that the useful life of the building when so acquired was 40½ years. There is no testimony as to the amount of depreciation taken on Hattie's returns. It is clear, however, that the allowable depreciation would have been based upon a useful life of not less than 40 years from date of acquisition. Upon the above facts, we think it reasonable to infer that the annual depreciation taken in Hattie's returns did not exceed 2½ per cent of $76,000, the amount of the pur-

chase price which she allocated to the building. See *Walter M. Joyce*, 25 T. C. 13 (1955); *D. G. Haley, et ux*, 16 T. C. 1509 (1951), reversed on other issues 203 F. 2d 815 (C. A. 5, 1953); *W. B. Mayes, Jr.*, 21 T. C. 286 (1953).

It is true that the evidence as to allocation of Hattie's purchase price between land and improvements is flimsy, but this is rather to be expected in view of the lapse of time since 1923. The evidence was introduced and received without objection, however, and it is all we have before us. There is nothing to suggest any inherent improbability in relation thereto. Moreover, we cannot avoid some feeling of surprise in noting that respondent takes the position, and vigorously argues on brief, that we should determine a zero basis for the donated portion of the property. Whether or not the provisions of section 113 (a) (2) apply literally to the instant case, the spirit of those provisions indicates that under circumstances such as those which here confront us, the respondent on his own part has some obligation to make a reasonable effort to determine basis for depreciation purposes. There is no indication in the record that such an effort has been made.

The remaining factors involved in this issue are not in dispute. In view of our findings and the foregoing discussion, we have no doubt that the parties will be able to dispose of this item by stipulation for the purpose of their proposed computations under Rule 50.

Petitioner makes the further contention, in the alternative, that if we determine (as we have) that the annuity payments are capital expenditures made for the purchase of the property in question, the portion of such payments deducted as interest in previous returns must be added to cost in determining unadjusted basis of the property for the purpose of calculating depreciation for the year in question. We cannot agree with petitioner's view.

Section 23 (1), I. R. C. 1939, which deals with depreciation, provides for a "reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business." The purpose of this provision is to allow tax-free recovery of the basis of depreciable assets by reasonable periodic depreciation allowances. In the instant case, the deductions taken by Stanley and petitioner, erroneously classified as interest, effectuated, for all practical purposes, a *pro tanto* recovery of basis in years prior to the one before us. If we were to determine the basis for depreciation in the year involved in the instant case without taking into account the fact that petitioner has already recovered a portion of that basis in the manner above referred to, the result would be, in effect, to allow petitioner a deduction for depreciation on a basis in excess of his unrecovered cost. We think it is clear that such an allowance would be in excess of what is "reasonable" within the meaning of section 23 (1). The issue here is not the same

as in *Kenosha Auto Transport Corporation*, 28 T. C. 421 (1957), in which the Commissioner challenged a deduction properly taken by taxpayer in the year before the Court on the ground that it had been erroneously deducted in a prior year. We there held that we must look to the proper treatment of the item in the year before us (and that the respondent must look to sec. 1311, *et seq.*, I. R. C. 1954, for any possible adjustment for prior years). In the instant case, while petitioner is, of course, entitled to a reasonable allowance for depreciation for the year in question, the basis therefor must be limited to unrecovered cost and cannot include a factor of cost already recovered in prior years.

In *Firemen's Insurance Co.*, 30 B. T. A. 1004 (1934), in which we considered the same problem, in principle, we said, in part (p. 1012) :

[A] taxpayer may not receive a deduction for depreciation on any property the full cost of which was deducted from income as an operating expense in the return for the year in which paid or incurred and allowed as such. This we think is the sound rule to apply in such cases. Under it the taxpayer obtains a return of the entire cost of the property tax-free and at the same time he is not given a preferred status or advantage as a result of his own error * * *

See also *Waldheim Realty & Investment Co.*, 25 T. C. 1216 (1956), reversed on other issues 245 F. 2d 823 (C. A. 8, 1957); *Reliable Incubator & Brooder Co.*, 6 T. C. 919, 928 (1946).

It follows from the foregoing that the so-called interest payments are not to be added to cost in determining unrecovered basis for the year before us.

The so-called interest payments deducted for the year in issue, however, have been disallowed. They are, of course, before us in the instant case, and constitute capital expenditures made for the purchase of the property in question. Since this additional cost has not been recovered, the amount thereof must be taken into consideration in determining the basis of the property. The remaining factors for computing additional depreciation based thereon after appropriate adjustment and allocation to the building are not in dispute, and we again assume that the parties will be able to stipulate the amount thereof for a Rule 50 computation.

*Decision will be entered under Rule 50.*