Jayne M. PERKINS, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 81–3542.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1982.

Decided March 14, 1983.

Jay Miller, Washington, D.C., for defendant-appellant.

A.T. Wendells, Seattle, Wash., for plaintiff-appellee.

Before KENNEDY and SKOPIL, Circuit Judges and JAMESON,* District Judge.

JAMESON, District Judge:

The United States has appealed from a judgment in favor of Jayne M. Perkins based on a decision of the district court holding that certain annuity payments made by Perkins constituted losses on a transaction for profit rather than capital expenditures and accordingly were deductible losses pursuant to 26 U.S.C. § 165(c)(2) (1976). We reverse.

## I. *Factual Background*[1]

In late 1963, taxpayer Jayne M. Perkins, and her husband, Clinton, decided to form a corporation, Seattle Furniture Mart, Inc. (SFMI) for the purpose of owning and operating a building devoted to providing showroom space and market opportunities for furniture manufacturers and agents. In anticipation of the formation of the company, Clinton and his father, Raymond Perkins, who was then 80 years old, on December 10, 1963, executed an annuity agreement, which provided in part:

FOR AND IN CONSIDERATION OF ONE HUNDRED THOUSAND DOLLARS ($100,000.00) of stock in SEATTLE FURNITURE MART, INC., CLINTON R. PERKINS agrees to pay an annuity to RAYMOND PERKINS, the annuitant, the sum of TWELVE HUNDRED FORTY-EIGHT DOLLARS ($1,248.00) per month, beginning with the 15th day of January, 1964, and a like amount on the same day of each succeeding month, continuing thereafter so long as the annuitant, RAYMOND PERKINS, shall live.

In the event of the death of CLINTON R. PERKINS prior to the death of the annuitant, RAYMOND PERKINS, then in that event it is agreed that RAYMOND PERKINS may enforce the payment of TWELVE HUNDRED FORTY-EIGHT DOLLARS ($1,248.00) per month against the estate of CLINTON R. PERKINS, by a continuing claim against the said estate. CLINTON R. PERKINS agrees, on behalf of his executors, administrators and assigns, that in the event of his death prior to that of the annuitant, his executors, administrators or assigns shall purchase from his estate in any stock legal reserve insurance company an annuity to pay to RAYMOND PERKINS the sum of TWELVE HUNDRED FORTY-EIGHT DOLLARS ($1,248.00) per month as long as RAYMOND PERKINS shall live.

In January 1964, a certificate for 10,000 shares of $10.00 par value voting common stock was issued to Raymond for $100,-000.00 in cash. Raymond endorsed the certificate over to Clinton. Clinton and Jayne received the stock as their community property, and the annuity obligation was their community debt.

There was no express provision in the agreement or otherwise by which payment of the annuity obligation was secured by a pledge or other security device covering the SFMI stock. The district court also found that "While the obligation arising under the Annuity Agreement was a community debt, Clinton by saying that the commercial annuity was to be purchased from 'his estate,' intended that such purchase be effected first from his one-half of the community estate."

One hundred thousand dollars, as quoted by an insurance company, was equal to the cost of an annuity of $1,248.00 per month for a term equal to Raymond's life expect-

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. The facts were well summarized in the decision of the district court, [81–1 USTC ¶ 9390], 48 AFTR 2d 5523 (1981), followed by unreported findings of fact and conclusions of law. The facts set out in this opinion are taken from the district court's decision and findings. Most of the facts were stipulated in a pretrial order and supplementary stipulation.

ancy on the date of the annuity agreement. Between 1963 and 1966 Clinton and Jayne made all payments under the agreement out of their community property assets. They reported no gain or loss or interest expense for these payments.

On December 14, 1966, Clinton died from a heart attack. His father was 83 years old at that time. In his Estate Tax Return (Form 706), the community property interest in the company stock was valued at $73,221.96. A debt for $74,900.00 was listed with the description "Raymond Perkins— cost of annuity under written agreement." This obligation was shown as a community debt.[2]

The district court found that following Clinton's death Jayne did not personally talk to Raymond about settlement of the estate's obligation to purchase an annuity. She focused her attention on operating and managing the estate's real property. All other matters, including problems relating to the annuity, were handled by her lawyers and accountants. She was informed by her attorney and an insurance man that if the estate had to purchase a commercial annuity it would cost more than $70,000.00.

According to Jayne's accountant, there was insufficient cash to purchase an annuity for over $70,000.00. Several alternatives were considered, including equity financing and having the estate continue making the annuity payments on its own. The accountant advised that if the "estate took the gamble and Raymond Perkins died before the liability was paid, the estate would have income." Jayne decided to have the estate keep on paying the annuity.[3] The accountant set up a liability account for the estate of $74,900.00 as of the date of Clinton's death and debited that account $1,248.00

per month. The account reached –0– in January, 1972.

On February 9, 1967, Raymond filed a claim against Clinton's estate, demanding "$74,900 plus interest at 6% annually." An affidavit attached to the claim stated that the amount of the claim "was based upon the present cost of procuring an annuity policy in any stock legal reserve insurance company which would pay him $1,248.00 monthly so long as [Raymond] may live . . . ." This claim was never approved as a claim for $74,900.00, but was approved as a continuing claim for monthly annuity payments and a claim for the purchase of an annuity. On October 15, 1968, Raymond demanded immediate purchase of the annuity and threatened suit; but monthly payments continued and no further legal action was taken.

The sale of some estate property in the fall of 1971 placed Clinton's estate in a more liquid position. Jayne ascertained from her insurance company the cost of a commercial annuity for Raymond's life expectancy. She decided to continue the annuity payments, and Raymond continued to accept the monthly payments.

Jayne and her accountant treated Clinton's community estate closed as of December 31, 1971. In 1972 the community property assets were distributed to Jayne and the stock was reissued to her. The assets were received subject to the obligation agreed to by the estate to continue the monthly payments to Raymond. On April 18, 1976, Raymond signed a "Release of Estate and Withdrawal of Creditor's Claim" in which he released the estate from its obligation under the 1963 annuity agreement in consideration of Jayne's personal promise to continue the $1,248.00 monthly payments for the rest of Raymond's life.

---

**2.** $74,900.00 was equal to the cost, as quoted by the insurance company, of an annuity of $1,248.00 per month for a term equal to Raymond's life expectancy on the date of Clinton's death.

**3.** The district court found that Jayne saw to it that the payments continued for the first few months after Clinton's death, but it is not known whether the payments were made from her assets or from community property. Once the estate assets had been marshaled and organized, the payments were continuously made from bank accounts which were operating accounts for real estate properties administered in Clinton's community property estate.

## II. *Tax Returns*

The cost of the annuity obligation was shown as a community debt in the schedule of liabilities in Clinton's estate return. Payments were charged to that liability and were not shown as additions to the tax basis of the capital stock. No gains, losses, or interest deductions were reported in the fiduciary income tax returns for Clinton's estate for the period 1966 through 1972, or in Jayne's individual income tax returns for the years 1967 through 1976.

Jayne filed individual income tax returns for the calendar years 1973 through 1976:

| TAXABLE YEAR | INCOME TAX PAID ON OR BEFORE DATE RETURN FILED |
|---|---|
| 1973 | $ 46,016.00 |
| 1974 | 103,165.00 |
| 1975 | 58,837.00 |
| 1976 | 67,274.00 |

Amended returns claiming refunds were filed in 1977:

| TAXABLE YEAR | DATE AMENDED RETURN FILED | AMOUNT OF REFUND CLAIMED |
|---|---|---|
| 1973 | April 15, 1977 | $ 10,080.00 |
| 1974 | October 6, 1977 | 10,453.00 |
| 1975 | October 6, 1977 | 9,511.00 |
| 1976 | October 6, 1977 | 7,840.00 |

The Commissioner disallowed the refunds on June 26, 1978, based on his determination that the taxpayer's private annuity payments were not deductible losses. This action to recover the tax refunds was filed on April 25, 1979.

## III. *Decision of the District Court*

The district court held that (1) appellee's "action in failing to buy the required annuity and substituting monthly payments and the acquiescence therein by Raymond Perkins constituted a transaction for profit under 26 U.S.C. § 165(c)(2)"; [4] (2) appellee "paid the monthly payments after Clinton's death to Raymond Perkins in satisfaction of her own individual liability, as well as that of the Clinton Perkins Estate"; (3) appellee's "liability for purchase of an annuity was $74,900 at the date of Clinton's death, and that liability was fully satisfied by the monthly payments through January, 1972"; and (4) payments made by appellee "after January, 1972 constituted deductible losses on a transaction for profit under 26 U.S.C. § 165(c)(2)." The court rejected the position of the United States that the payments were simply nondeductible capital expenditures incurred either as part of the purchase price of the SFMI stock or in consideration of the discharge of Raymond's claim against the estate.

## IV. *Contentions on Appeal*

Appellant contends that appellee was not entitled to a loss deduction for amounts paid to Raymond in excess of the cost of a commercial annuity at the time of Clinton's death because (1) the annuity payments made subsequent to Clinton's death were attributable to the original stock sale and did not give rise to a new transaction; and

---

4. § 165 reads in pertinent part:

   (a) General rule. There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

   . . . . .

   (c) Limitation on losses of individuals. In the case of an individual, the deduction under subsection (a) shall be limited to—

   . . . . .

   (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business;

(2) assuming, *arguendo,* that Clinton's estate entered into a transaction for profit, appellee would not be entitled to a loss deduction since the post-1971 payments were incurred with respect to a transaction entered into by the estate and not by appellee, the taxpayer.

## V. *Was there a Transaction for Profit?*

Section 165(a) and (c)(2) of the Internal Revenue Code of 1954, 26 U.S.C. § 165(a) and (c)(2) (1976), allows a deduction to individuals for "losses incurred in any transaction entered into for profit, though not connected with a trade or business..." Capital expenditures, however, are not deductible. 26 U.S.C. § 263 (1976). Capital expenditures usually must be added to "the basis of the capital asset with respect to which they are incurred, and are taken into account for tax purposes either through depreciation or by reducing the capital gain (or increasing the loss) when the asset is sold." *Woodward v. Commissioner,* 397 U.S. 572, 574–5, 90 S.Ct. 1302, 1304, 25 L.Ed.2d 577 (1970).

It has been held that where a taxpayer not in the business of writing annuities acquires property in consideration for a promise to make annuity payments, these payments are treated as nondeductible capital expenditures. *Dix v. Commissioner,* 392 F.2d 313, 318 (4 Cir.1968); *Citizens National Bank v. Commissioner,* 122 F.2d 1011, 1014 (8 Cir.1941), (affirming the decision of the Tax Court, 42 B.T.A. 539 (1940)), *cert. denied,* 315 U.S. 822, 62 S.Ct. 913, 86 L.Ed. 1219 (1942); *Corbett Investment Co. v. Helvering,* 75 F.2d 525 (D.C.Cir.1935). Profit or loss normally arises upon disposition of the property, but no deductible loss is triggered when the annuitant is paid in excess of the calculated value of the annuity provided for in the agreement. *Citizens National Bank,* 122 F.2d at 1015; *Kaufman's, Inc. v. Commissioner,* 28 T.C. 1179, 1184 (1957). Where these payments represent the cost of acquiring property, they are capitalized regardless of the number of payments made or the total amount to be paid. *Citizens National Bank,* 122 F.2d at 1015.

The district court rejected this capital expense analysis as to the annuity payments made after Clinton's death. The court cited *Sheridan v. Commissioner,* 18 T.C. 381 (1952), in which the taxpayer and another person executed a $100,000.00 mortgage in partial consideration for the purchase of realty. Years later, the mortgagee released the mortgage, $40,000.00 as a gift and the remaining $60,000.00 in consideration of a promise by the mortgagors to pay her a lifetime annuity. The taxpayer's ultimate payments in excess of his share of the mortgage debt ($30,000.00 or one-half of the $60,000.00) were held by the Tax Court to be deductible as a loss incurred in a transaction entered into for profit. *Sheridan,* 18 T.C. at 385.

In *Kaufman's Inc., supra,* decided subsequent to *Sheridan,* the Tax Court held *Sheridan* inapplicable to situations where the annuity payments are part of the bargained-for consideration for the transfer of property. In *Kaufman's, Inc.,* Hattie Kaufman transferred certain realty to her son in part as a gift, and in part in consideration for the son's promise to pay her an annuity of $400 per month for the rest of her life. The son subsequently transferred this property to the corporate taxpayer in exchange for all of its outstanding stock. The taxpayer assumed the annuity contract obligation. The taxpayer argued that the subsequent annuity payments were deductible as a loss because they exceeded the discounted value of the annuity, based on Hattie's life expectancy as of the date of the original sale transaction. In rejecting this contention and distinguishing *Sheridan,* the Tax Court noted, 28 T.C. at 1186, that in *Sheridan,* "no issue arose, and, of course, no consideration was given to the question of whether or not annuity payments paid for the acquisition of property were capital expenditures." The Tax Court noted further that "the release of a mortgage in consideration for the payment of the annuity was, for all practical purposes, the same as the sale of an annuity for cash." *Id.* Where, however, as in *Kaufman,* the annuity agreement was entered into as consideration for the purchase of property, "the taxable

transaction to the payor will normally occur upon disposition of the property." *Id.* The Tax Court concluded that the annuity payments were part of the purchase price of the property and as such were capital expenditures. *Id.*

While not precisely in point factually, we find the rationale of *Kaufman's, Inc.* controlling under the facts of this case. The crucial question is whether, as the appellant contends, the annuity payments made after Clinton's death "were inextricably bound to the purchase of the SFMI stock," or, as appellee contends, "the annuity undertaken by the taxpayer was not tied to the stock," but was a "new arrangement" and "a different liability" assumed by the estate and surviving spouse. The district court found that the obligation to buy a commercial annuity was activated at the time of Clinton's death and that the estate, with the taxpayer as executrix, substituted a private annuity for its obligation to purchase a commercial annuity. The court concluded that this substitution and the subsequent acquiescence of Raymond constituted a transaction for profit, separate from the purchase of the stock.

We agree with appellant that the annuity payments here were part of the purchase price of the stock [5] even though the payments exceeded the discounted value of a commercial annuity, as was the case in *Kaufman.* The taxable transaction to the payor will occur upon disposition of the stock. *Sheridan* is distinguishable because the annuity there was substituted for a different type of obligation, a fixed sum mortgage debt. In the present case, the obligation of monthly payments for Raymond's life pursuant to the purchase agreement remains unchanged. Merely the method of funding has changed. *Sheridan* does not support the district court's conclusion that the mere substitution of one form of payment for another should result in an entirely new transaction with tax consequences unrelated to the original purchase of stock.

It is clear that the taxpayer's decision to continue the private annuity payments was unilateral and not the result of any express agreement with Raymond.[6] Raymond received no consideration for any "new transaction". He continued to receive monthly the exact amounts he would have received under the 1963 agreement. We conclude that the unilateral acts of the estate and taxpayer under the facts of this case did not constitute a transaction for profit.

## VI. *Conclusion*

We conclude that the annuity payments made subsequent to Clinton's death were attributable to the purchase of the SFMI stock and did not constitute a new "transaction for profit".[7] Breaching the obligation of the estate to purchase a commercial annuity through the assumption of the monthly payments by the estate and taxpayer did not result in a new and different liability permitting the claimed deductions. The estate and taxpayer could not unilaterally create a "new transaction" through substituting this arrangement for the original agreement. There was no new agreement with Raymond prior to the "Release of Estate and Withdrawal of Creditor's Claim"

---

**5.** As appellant notes, the taxpayer, as executrix of Clinton's estate, "would not have continued the annuity payments after Clinton's death *but for* the 1963 stock purchase agreement." Moreover, the parties stipulated that all of the community property assets, including the SFMI stock, were distributed to the taxpayer subject to the obligation to continue the monthly payments required by the purchase agreement.

**6.** Nor can a binding agreement for a new arrangement be inferred from Raymond's acceptance of monthly payments after 1966. As noted *supra,* the "Release of Estate and Withdrawal of Creditor's Claim" was not executed until April 18, 1976. In the meantime, Raymond had

filed a claim against the estate, had demanded immediate payment of the annuity, and had threatened suit. Under these circumstances continued acceptance of the monthly payments could not be construed as a new contractual relation with the taxpayer.

**7.** Appellant does not question the district court's finding that "The evidence that the plaintiff's intention was to save money is overwhelming." Appellee was in effect gambling on Raymond's life expectancy. The profit motive in itself is not, however, sufficient to create a deductible loss under § 165(c)(2).

signed on April 18, 1976. The payments made by the estate and taxpayer were attributable to the original agreement and therefore constituted capital expenditures.[8]

REVERSED.

---

8. Having reached this conclusion, we find it unnecessary to consider appellant's other contention, i.e., that assuming, *arguendo,* that Clinton's estate entered into a transaction for profit by its decision not to purchase a commercial annuity, appellee would not be entitled to a loss deduction, since the post-1971 payments were incurred with respect to a transaction entered into by the estate and not by appellee, the taxpayer.