130 T.C. No. 8

UNITED STATES TAX COURT

DANTE AND SANDI PERANO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5543-06.                    Filed May 7, 2008.


        In 1994 and 1996, Ps, the sole shareholders of AG,
a controlled foreign corporation as defined in sec.
957, I.R.C., transferred to AG United States real
property and notes secured by such property in exchange
for private annuity agreements that provided for the
future payment of monthly annuities to Ps for their
remaining joint lives.  For 1994-2001, AG accrued
liabilities with respect to those agreements in amounts
that, for 2001, exceeded income and, cumulatively,
exceeded accumulated earnings and profits as of Dec.
31, 2001.  Relying upon sec. 953, I.R.C., and the
regulations thereunder, Ps treated those accruals as in
the nature of life insurance reserves, which reduce
earnings and profits, thereby causing Ps not to report
income from AG for 2001 under sec. 951(a)(1), I.R.C.
See secs. 952(c), 956(b)(1), I.R.C.

        1.  <u>Held</u>:  Because the transactions that gave rise
to the private annuity agreements constituted capital
expenditures by AG and because AG's accruals under
those agreements constituted reserves for future
contingencies, those accruals did not reduce AG's
earnings and profits.

2.  Held, further, because AG was neither in the insurance business nor in receipt of insurance income, sec. 953, I.R.C., is inapplicable to AG.

3.  Held, further, Ps improperly failed to report income from AG for 2001 under sec. 951(a)(1), I.R.C.


Francis X. Mohan III, for petitioners.

Christian A. Speck, for respondent.


OPINION


HALPERN, Judge:  By notice of deficiency dated December 22, 2005, respondent determined deficiencies in petitioners' Federal income taxes of $203,939 and $70,815 for 2001 and 2002, respectively, and accuracy-related penalties of $40,788 and $14,163 for those years, respectively.

Unless otherwise indicated, all section references are to the Internal Revenue Code for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the only issue for decision is whether accruals for the future payment of annuities made by a controlled foreign corporation (CFC), as that term is defined in section 957, reduced that CFC's earnings and profits available for the payment of dividends to shareholders.  The parties stipulate that, if the Court agrees with respondent that the accruals did not reduce the CFC's earnings and profits, then petitioners must include as items of gross income for 2001 (1) $64,682 under section 951(a)(1)(A), and (2) $392,109 under sections

951(a)(1)(B) and 956;[1] and, conversely if the Court agrees with petitioners that the accruals did reduce the CFC's earnings and profits, then petitioners are not required to include any amounts in gross income under the foregoing provisions.[2]

## Background

This case was submitted fully stipulated under Rule 122. The facts stipulated by the parties are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. At the time the petition was filed, petitioners resided in the State of Nevada.

The following is a summary of the facts necessary for our discussion.

American General Ltd. (American General) is a corporation formed in the Isle of Man in October 1992. From its incorporation through 2001, 100 percent of the stock of American General was owned by a fiduciary pursuant to an irrevocable trust

---

[1] Those provisions are part of subpt. F, pt. III, subch. N, ch. 1, subtit. A of the Internal Revenue Code (subpt. F). Pursuant to those provisions and sec. 951(b) (defining the term "United States shareholder"), each United States shareholder of a controlled foreign corporation (CFC) includes in his gross income his pro rata share of the CFC's (1) subpt. F income (as defined in sec. 952) and (2) earnings invested in United States property (as determined under sec. 956).

[2] The stipulation actually describes the issue as whether the CFC properly accrued the future annuity expenses; but, as discussed infra, it is clear that the issue for decision is more accurately described as whether those accruals reduced the CFC's earnings and profits. (Pursuant to sec. 952(c), income inclusions under sec. 951(a)(1)(A) may not exceed a CFC's earnings and profits for the taxable year, and, pursuant to sec. 956(a)(2), income inclusions under sec. 951(a)(1)(B) may not exceed a CFC's "applicable earnings"; i.e., its current or accumulated earnings and profits. See sec. 956(b)(1).)

agreement. For Federal income tax purposes, however, the parties stipulate that "the tax effects are to be treated as though * * * [American General] was owned by petitioners." At all relevant times, American General (1) was a CFC, and (2) was not regulated as an insurance company under the laws of the Isle of Man, the United States, or any State thereof.

On each of American General's Forms 1120-F, U.S. Income Tax Return of a Foreign Corporation, in evidence, it listed the United States as its principal business location and "Rental and Sales" of "Real Estate" as its "[b]usiness activity" and "[p]roduct or service".

On March 31 and October 31, 1994, petitioners transferred real property located in Texas to American General in exchange for private annuity agreements (annuity agreements 1 & 2). On January 1, 1996, petitioners transferred promissory notes secured by real property located in Texas to American General also in exchange for a private annuity agreement (annuity agreement 3). The annuities payable to petitioners under the annuity agreements (collectively, the annuity agreements) are payable monthly for petitioners' joint lives. The payments are to commence no earlier than April 30, 2006, in the case of annuity agreement 1, November 30, 2010, in the case of annuity agreement 2, and February 1, 2011, in the case of annuity agreement 3. Under each of the annuity agreements, American General may defer the payment commencement date for up to 5 years. American General's obligation to make annuity payments to petitioners under the

annuity agreements terminates upon the death of the survivor, irrespective of the number of payments made to that point or whether any payments at all have been made to either petitioner.

American General keeps its books and records on the accrual method of accounting. With respect to each of the annuity agreements, it recorded a liability in the amount stated in the agreement as the fair market value of the property received in exchange for the agreement. It recorded liabilities in the following amounts:

| Agreement | Amount |
|---|---|
| Annuity agreement 1 | $493,200 |
| Annuity agreement 2 | 582,500 |
| Annuity agreement 3 | 353,355 |

For the years 1994 through 2001, American General accrued annuity expenses with respect to the annuity agreements as liabilities on its books and records in the aggregate amount of $949,119, as follows:

| Year | Amount |
|---|---|
| 1994 | $32,021 |
| 1995 | 84,103 |
| 1996 | 114,665 |
| 1997 | 123,431 |
| 1998 | 132,797 |
| 1999 | 142,885 |
| 2000 | 153,756 |
| 2001 | 165,461 |
| Total | 949,119 |

On the Form 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, attached to petitioners' 2001 Form 1040, U.S. Individual Income Tax Return, petitioners reported negative current and accumulated earnings and profits for American General of $100,779 and $492,328, respectively.  For 2001, if the $165,461 accrued for that year for deferred annuities is disregarded, American General would have positive current earnings and profits of $64,682, and, if the $949,119 total accruals for deferred annuities through December 31, 2001, are disregarded, American General would have positive accumulated earnings and profits of $456,791.[3]

American General's average investment in United States property at the end of each quarter in 2001 was $1,360,567.

<u>Discussion</u>

I.  <u>Introduction</u>

On two occasions in 1994, petitioners transferred real property to American General, and, on one occasion in 1996, petitioners transferred promissory notes secured by real property to American General.  On none of those occasions did American General pay anything immediately for the property it received (the property or properties).  Instead, on each occasion, American General promised to pay for the property by making

---

[3]  As noted <u>supra</u>, the parties agree that, if the accruals for deferred annuity payments are disregarded for purposes of determining American General's earnings and profits, petitioners' 2001 income would then include $64,682 of subpt. F income under sec. 951(a)(1)(A) and $392,109 ($456,791 minus $64,682) representing earnings invested in United States property taxable under secs. 951(a)(1)(B) and 956.

deferred payments commencing from 12 to 16 years in the future and lasting (if they still survived) for the lives of petitioners.  The terms of those promises are manifest in what we have described as annuity agreements 1, 2, and 3.  Recognizing that the present value of its obligation to make the annuity payments promised would increase every year until the annuity starting dates, American General accrued as an annual expense an addition to an accounting reserve to reflect that increase.  We must determine whether those accruals were a proper charge to American General's earnings and profits.  We conclude that they were not.

II.  Analysis

A.  Introduction

Petitioners summarize their argument as follows:

Petitioners believe that its [American General's] accrued annuity expense constitutes a reserve to liquidate its future obligation and is allowable under Section 953 and the regulations thereunder as a reserve for estimated expenses for purposes of calculating its current and accumulated E&P.

Section 953 defines the term "insurance income" for purposes of determining a CFC's subpart F income.  See sec. 952(a)(1).  If it were not for petitioners' claim that section 953 applies, their argument that American General properly reduced its earnings and profits on account of annual accruals for additions to a reserve reflecting its obligation to make annuity payments pursuant to the annuity agreements could be disposed of in short order.  Generally, annuity payments made for property are considered payments made to purchase the property.  E.g., Perkins

v. United States, 701 F.2d 771, 775 (9th Cir. 1983). The payments constitute capital expenditures, which are not deductible, sec. 263(a)(1), regardless of the number of payments made or the total amount to be paid, Perkins v. United States, supra at 775. The payments give the taxpayer a cost basis in the acquired property, sec. 1012, and the taxpayer recovers his investment in the property by way of deductions for depreciation, sec. 167(a), or by way of an offset of any unrecovered basis against the amount realized on a sale or disposition of the property, sec. 1001(a).

"Earnings and profits" is a tax concept that generally relates to the determination of whether a distribution from a corporation to its shareholders is properly treated as a dividend or a return of capital. See secs. 301(c), 316(a); Henry C. Beck Co. v. Commissioner, 52 T.C. 1, 6 (1969), affd. per curiam 433 F.2d 309 (5th Cir. 1970). Capital expenditures do not reduce earnings and profits. Pa. Forge Corp. v. Commissioner, a Memorandum Opinion of this Court dated Sept. 6, 1943 ("the accrued interest * * * represented capital expenditures and was not a proper charge against petitioner's earnings and profits"); Patty v. Commissioner, a Memorandum Opinion of the Board of Tax Appeals dated May 27, 1936 ("Organization expenses are capital expenditures * * * and, therefore, they are not to be considered in determining the earnings or profits available for

distribution."[4]), revd. on other grounds 98 F.2d 717 (2d Cir. 1938).[5]

Moreover, even if annuity payments do not have to be capitalized, the obligation to commence life annuity payments in the future is contingent and for that reason does not reduce earnings and profits absent a special exception like that applicable to life insurance reserves. See Dean v. Commissioner, 9 T.C. 256, 266 (1947) (reserves for contingent future expenses do not reduce earnings and profits), affd. 187 F.2d 1019 (3d Cir. 1951). Professors Bittker and Eustice, in their treatise, Federal Income Taxation of Corporations and Shareholders, point out that, in determining whether a distribution to shareholders constitutes a taxable dividend, reference is made to the distributing corporation's earnings and profits rather than to its surplus, in part because surplus, unlike earnings and profits, is reduced by reserves for contingencies. Bittker & Eustice, Federal Income Taxation of Corporations and

---

[4] This result is consistent with sec. 312(n)(3), which denies 5-year amortization of such expenditures under sec. 248 for purposes of determining a corporation's earnings and profits.

[5] Not permitting capital expenditures to reduce earnings and profits is justified on the ground that "capital expenditures accomplish a mere change in the form of assets, and 'earnings or profits' should then be affected only through the depreciation account." Paul, "Ascertainment of 'Earnings or Profits' For Purpose of Determining Taxability of Corporate Distributions", 51 Harv. L. Rev. 40, 45 n.18 (1937).

Shareholders, par. 8.03[2], at 8-20 (7th ed. 2000). The authors describe the problem thus:

> If these reserves were taken into account, the floodgates would be opened to a stream of tax-free cash distributions for as long as the corporation's directors could conjure up contingencies that would warrant the creation of reserves. It is not surprising, therefore, that accounting surplus was rejected as a criterion and that the phrase "earnings and profits" acquired a meaning more in keeping with its function. [Id.]

We shall now turn to petitioners' section 953 argument.

B. Section 953 Argument

Life insurance companies are subject to income taxation pursuant to part I, subchapter L, chapter 1, subtitle A of the Internal Revenue Code (part I and subchapter L, respectively). Part I comprises sections 801 through 818. For a life insurance company to be taxable pursuant to part I, the company must first be an insurance company within the meaning of section 816(a). In pertinent part, section 816(a) provides: "the term 'insurance company' means any company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts". A life insurance company includes in its gross income premiums and other consideration received on annuity contracts. See sec. 803(a)(1)(A). In determining its taxable income, it deducts additions to reserves set aside to pay claims arising under annuity contracts. See secs. 804(a)(1), 805(a)(2), 807(b), (c)(1), 816(b). Therefore, it reduces its earnings and profits on account of those reserve additions. See sec. 1.312-6(a), Income Tax Regs. (providing, in pertinent part, that "the

amount of the earnings and profits in any case will be dependent upon the method of accounting properly employed in computing taxable income").

On brief, petitioners concede that American General is not an insurance company: "Respondent is correct in pointing out that[,] as a real estate company, American General is not an Insurance Company." They argue, however, that that does not matter: "American General * * * [does not need to be an insurance company in the business of selling insurance] in order to reduce * * * [earnings and profits] by the future annuity obligations." They rely on section 953, which, in pertinent part, provides:

SEC. 953. INSURANCE INCOME.

(a) Insurance Income.--

(1) In general.--For purposes of section 952(a)(1), [which provides that "subpart F income" includes "insurance income"] the term "insurance income" means any income which--

(A) is attributable to the issuing (or reinsuring) of an insurance or annuity contract, and

(B) would * * * [subject to certain modifications] be taxed * * * [as if] such income were the income of a domestic insurance company.

As we understand it, the essence of petitioners' argument is that, on account of entering into the annuity agreements, American General had insurance income within the meaning of section 953(a)(1), which allows it to accrue additions to reserves, and reduce its earnings and profits, in anticipation of

making the annuity payments called for by those agreements, notwithstanding that it is not an insurance company.[6]

To support their argument, petitioners rely on regulations proposed under section 953. Proposed regulations are accorded little, if any, deference. Estate of Ratliff v. Commissioner, 101 T.C. 276, 278 (1993). In any event, those proposed regulations weaken, rather than support, petitioners' argument. Section 1.953-6(a), Proposed Income Tax Regs., 56 Fed. Reg. 15560 (April 17, 1991), deals with the applicability of subchapter L to CFCs. In pertinent part, subparagraph (1) of that section provides the following general rule: "A controlled foreign corporation which has insurance income under section 953 * * * shall compute its insurance income * * * under part I of subchapter L". (Emphasis added.) Section 1.953-6(f), Proposed Income Tax Regs., 56 Fed. Reg. 15561 (April 17, 1991), deals with CFCs that, if they were domestic corporations, would not qualify to be taxed under subchapter L as insurance companies. In pertinent part, subparagraph (1) of that proposed regulation provides:

> A controlled foreign corporation will compute its insurance income as if it were a domestic insurance company subject to part I of subchapter L (relating to life insurance companies) only if it can meet the requirements of section 816(a) of the Code taking into account only that portion of its business which

---

6 Petitioners also acknowledge that "American General's obligation to make annuity payments may not qualify as a deductible expense for tax reporting purposes". Nonetheless, they insist that that obligation "does constitute a reduction of * * * [earnings and profits]."

> involves the issuing or reinsuring of insurance or annuity contracts. [Emphasis added.]

Petitioners' first difficulty in finding support in the proposed regulations is that they have failed to prove that American General's business was to any extent the business of issuing insurance or annuity contracts. The issuance of insurance, to include annuities, requires risk shifting and risk distribution. See Helvering v. Le Gierse, 312 U.S. 531, 539 (1941); Wright v. Commissioner, T.C. Memo. 1993-328 ("The amounts in the annuities did not constitute insurance because no risk shifting or risk distribution occurred."), modified per order (Oct. 29, 1993), affd. without published opinion 73 F.3d 372 (9th Cir. 1995). In the case of the annuity agreements, there was no risk distribution (i.e., the pooling of possible annuity termination dates) among a broad number of individuals. American General's mortality risk was spread between the lives of only two individuals; viz, petitioners. We said in Amerco & Subs. v. Commissioner, 96 T.C. 18, 41 (1991), affd. 979 F.2d 162 (9th Cir. 1992): "The concept of risk-distributing emphasizes the pooling aspect of insurance: that it is the nature of an insurance contract to be part of a larger collection of coverages, combined to distribute risk between insureds." Moreover, respondent argues that there was no risk shifting (one party shifting the risk of a loss to another party), since petitioners are the owners, at least for tax purposes, of American General. To find that there was no insurance, it is sufficient that we find that

there was no risk distribution, which we do find.  It is not necessary that we consider whether there was risk shifting.

Even were we to put aside petitioners' failure to prove that American General was in the insurance business, they have failed to prove that American General realized any income in connection with the annuity agreements.  American General received the property in exchange for those agreements.  On its books and records, it accounted for the obligations imposed on it by the annuity agreements as liabilities.  Petitioners do not claim that they reported premium income, or, indeed, any income, as a result of incurring those obligations.[7]

Petitioners have failed to prove that American General received insurance income within the meaning of section 952(a)(1).  American General does not fall within the ambit of the rules of part I, allowing life insurance companies to deduct additions to reserves set aside to pay claims arising under annuity contracts, nor can it reduce its earnings and profits as a life insurance company could on account of those contingent claims.

---

[7]  In fact, there is nothing in the record to indicate that American General reported any income other than income from real estate (i.e., sales income, rentals, and mortgage interest).

III.  Conclusion

Because American General's accruals for the future payment of annuities to petitioners did not reduce its earnings and profits, respondent's adjustments increasing petitioners' 2001 income under section 951(a)(1) are sustained.

Decision will be entered under Rule 155.